**UNITED STATES of America,**
**Plaintiff,**

**v.**

**PARAMOUNT PICTURES, INC., et al.,**
**Defendants.**

**Equity No. 87–273.**

United States District Court,
S. D. New York.

March 22, 1971.

Maurice Silverman, Asst. Atty. Gen., Antitrust Div. Dept. of Justice, Washington, D. C., for United States of America.

White & Case, New York City, for petitioner American Broadcasting Companies, Inc.; Haliburton Fales, II, John J. McAvoy, New York City, of counsel.

Hogan & Hartson, Washington, D. C., for Syufy Enterprises, for amicus curiae;

E. Barrett Prettyman, Jr., Washington, D. C., of counsel.

PALMIERI, District Judge.

These are consolidated petitions by American Broadcasting Companies, Inc. (American) seeking court approval, pursuant to Section 111 A 6(b) of the Paramount Consent Judgment, of its proposed acquisition of four motion picture theatres in Sacramento, California: a dual auditorium theatre in the Country Club Shopping Center, and a second dual auditorium theatre in the Florin Shopping Center. It is common ground that pursuant to the provisions of the consent judgment by which it is bound the petitions should be granted if American sufficiently demonstrates that the proposed acquisitions will not unduly restrain competition in Sacramento, the relevant market area.

The court hearing took place in this matter on December 10, 1970, after several months' notice by the Attorney General to prospective competitors and other putative objectors. Upon the hearing the Attorney General's position was in support of the petitions.

A competitor, Syufy Enterprises (Syufy), presently operating four motion picture theatres in the Sacramento market, two drive-ins and two conventional theatres, moved to intervene as a party or in the alternative to appear as amicus curiae. At the outset of the hearing the motion to intervene as a party was denied, without prejudice to its renewal, and Syufy was permitted to appear as amicus. Syufy has submitted voluminous papers in opposition to the petitions and has pressed its motion to intervene.

*Syufy's Motion to Intervene as a Party*

After considerable reflection this court adheres to the views expressed as its tentative position at the outset of the hearing. Briefly put, it would be unwise and impractical for Syufy to be permitted to assume the role of a full-fledged litigant in these proceedings. It is the Attorney General who is charged with vindicating the public interest. His role should neither be impaired or diminished by way of intervention.

Intervention by an allegedly aggrieved party would impose an intolerable burden upon the court. The *Paramount* judgments affect myriad relationships of a day-to-day business nature. If every person who considered himself aggrieved in the course of such business were free to come to court as an intervenor the court would be unable to keep these proceedings within reasonable compass. It is not at all surprising that the Supreme Court has consistently refused to permit intervention in the *Paramount* case, both during the pendency of the proceedings and after judgment was entered. St. Louis Amusement Co. v. United States, 326 U.S. 680, 66 S.Ct. 31, 90 L.Ed. 397 (1945); Ball, Trustee v. United States, 338 U.S. 802, 70 S.Ct. 61, 94 L.Ed. 486 (1949); Partmar Corp. v. United States, 338 U.S. 804, 70 S.Ct. 69, 94 L.Ed. 486 (1949); Sutphen Estates, Inc. v. United States, 342 U.S. 19, 23, 72 S.Ct. 14, 96 L.Ed. 19 (1951); Wometco Television and Theatre Company v. United States, 355 U.S. 40, 78 S.Ct. 120, 2 L.Ed.2d 71 (1957). Indeed, there was an indication by this court at the time the *Paramount* judgments were being entered, that there should be no intervention. The two final decrees entered on February 8, 1950, by this court provided expressly, in the retention of jurisdiction clause, that there should not be any right of intervention in the *Paramount* case by those who are not parties to the cause. While the consent judgment as to the *Paramount* defendants, which was entered on March 3, 1949, and which preceded these decrees, does not so provide, this language is substantially incorporated in the retention of jurisdiction clause of the three Consent Judgments which followed the entry of this court's decrees of February 8, 1950—the consent judgments as to the *Warner* defendants, as to the Twentieth Century-Fox defendants, and as to Loew's Incorporated. See also, United States v. Loew's Incorporated, 136

F.Supp. 13 (1955); United States v. Loew's Incorporated, 20 F.R.D. 423 (S.D. N.Y.1957). Syufy's reliance upon Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967), in no way changes the unbroken precedent against intervention in the *Paramount* cases. In *Cascade* the Supreme Court had previously held that the acquisition of Pacific Northwest Pipeline by El Paso Natural Gas Company violated Section 7 of the Clayton Act and had ordered divestiture. Three years passed and nothing was done. The State of California, among others, sought leave to intervene in the district court action, with a view to framing a divestiture plan. The district court denied the motion. In overruling the district court the Supreme Court held that "protection of California interests in a competitive system was at the heart of our mandate directing divestiture." 386 U.S. at 135, 87 S.Ct. at 937.

The facts in *Cascade* are clearly distinguishable from the facts here. One cannot avoid the impression that the Supreme Court was motivated by the long three-year delay following its divestiture decree. During this period nothing was accomplished. The lack of diligence in fulfilling its mandate was apparent. It was undoubtedly the cause for the grant of intervention. The unusual facts of *Cascade* make it sui generis. It is not available to Syufy as a precedent for intervention here. Intervention in *Cascade* was apparently adopted by the Supreme Court as a convenient device for preventing any further disregard of its order. Two district courts have construed the *Cascade* decision in much the same way. In Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175, 179, fn. 16 (1969), the court noted that: "The majority's splenetic displeasure with the substantive provisions of the divestiture plan approved by the Government and the trial court may have been an important factor in the liberal reading given to Rule 24 (a) in *Cascade*."

And in Moore v. Tangipahoa Parish School Board, 298 F.Supp. 288, 291, fn. 4 (E.D.La.1969): "There are indications that '*Cascade* should not be read as a *carte blanche* for intervention by anyone at anytime,' Hobson v. Hansen, D.D.C., 1968, 44 F.R.D. 18, 25, as Justice Stewart feared in his stinging dissent in *Cascade*. The Court in *Cascade* was critical of the Justice Department for 'settling' with defendant and of the District Judge for ignoring the Supreme Court's earlier mandate. On remand, it ordered the District Judge removed from the case. * * *" It is of considerable interest that the Supreme Court, later in the very same term in which the *Cascade* decision was rendered, affirmed the denial of a motion by a competitor to intervene in an antitrust action in which a final decree had already been entered. United States v. Western Electric, 1968 T.C. ¶ 72,415 (D.N.J.1968), aff'd sub nom Clark Walter & Sons, Inc. v. United States, 392 U.S. 659, 88 S.Ct. 2286, 20 L.Ed.2d 1348 (1968).

Nor can intervention in administrative proceedings serve as a guide for intervention in litigation before the federal courts. The considerations involved in each instance are quite different. Moore's Federal Practice, vol. 3B, § 24.06[3.–1] et seq. The decision in American Communications Association v. United States, 298 F.2d 648 (2d Cir. 1962) construed statutory provisions relating to rights of intervention in proceedings before the Federal Communications Commission. It has no applicability here. Much the same can be said of other cases cited by Syufy—namely, Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); National Welfare Rights Organization v. Finch, 429 F.2d 725 (D.C.Cir.1970); and Virginia Petroleum Jobbers Ass'n v. F.P.C., 105 U.S.App.D.C. 172, 265 F.2d 364 (1959). All these cases involved the construction of relevant statutes affecting intervention in administrative proceedings. None of them dealt with intervention in proceedings before the federal courts.

Reference must also be made to a case pending before this court. Columbia

Pictures v. American Broadcasting et al., 70 Civ. 4202 ELP, a private antitrust action involving American as one of the defendants and affecting both the motion picture and television industries. Syufy suggests that any decisions with respect to the petitions presently before the court be held in abeyance pending resolution of this case because comparable issues are involved the resolution of which would dispose of the issues presented to the court by American's petitions. The *Columbia Pictures* action is in its initial stages and it is entirely too soon to draw any conclusions with respect to the significance it may ultimately have. To hold these petitions in suspense until the disposition of the *Columbia Pictures* case would be tantamount to affording Syufy, which is not a party, a stay of these proceedings, and hence a decision on the merits *ad limine,* upon speculative grounds. Syufy is not entitled to this relief either as a matter of procedure or for any substantive reasons.

Notwithstanding the critical views of the Attorney General's role expressed in some of the Syufy papers, the public interest has been well served by the Attorney General. This court has had the opportunity to scrutinize the fulfillment of that role in scores of proceedings relating to the enforcement of the antitrust decrees affecting the motion picture industry. It can come to only one conclusion—that the Attorney General has acted in every instance with a complete and conscientious dedication to his important responsibilities and with a full awareness of the letter and spirit of the decrees he was charged with enforcing. Mr. Raymond J. Syufy and Syufy Enterprises are not unknown to this court. This multi-state motion picture exhibition enterprise, an important privately owned circuit, has been built up by Mr. Syufy from the ground and under the protective wing of the antitrust decrees during the recent approximately twenty year period of enforcement. In 1969 his motion picture enterprise earned a net of one million dollars and it presently operates fifty-three theatres. Mr. Syufy has manifested an acute awareness of the meaning of these decrees and he has retained able lawyers to press for recognition of his alleged rights. He has recently initiated a treble damage suit against American in the United States District Court in San Francisco. The Syufy motion picture enterprise is a self-made, vigorous competitor in an industry where the doors would probably have remained shut against him had it not been for the very decrees the enforcement of which he so severely criticizes in these proceedings.

*The Sole Issue Before This Court Is Whether Petitioner's Proposed Acquisitions Will Unduly Restrain Competition in the Sacramento Market.*

It is necessary to emphasize and to bring into proper perspective the appropriate functions of this court with respect to the petitions before it. The objections mounted by Syufy cover a very broad spectrum. They are often irrelevant and collateral to the issue which this court must decide—whether petitioner has shown to the satisfaction of the court that the proposed acquisitions will not unduly restrain competition in the Sacramento market. The petitioner is vigorously attacked by Syufy with respect to its alleged activities far removed in time and place from the current competitive characteristics of the Sacramento market for motion picture exhibition.

Preliminarily it must be noted that the judgments entered in the *Paramount* case expressly permit the acquisition of theatres by the divorced circuits in every instance where there is a showing that the acquisition "will not unduly restrain competition." And the petitioner's predecessor, United Paramount Theatres, Inc., had interests in 1,424 theatres at the time of the decree on March 3, 1949, of which it could retain, after divestiture, a total of substantially less than half, namely, 651. American has at no time attained this total or even approached it. As of the end of 1970 it had interests in 434 theatres, or two-thirds of the 651 it could have retained under the provisions of the decree some twenty-two

years earlier. Fourteen of these theatres were closed and nine subleased to others. Therefore, as of December 31, 1970, American actually operated 411 theatres, almost 250 theatres less than the 1949 judgment permitted it to retain and operate. While Syufy refers to American as a "monolithic giant," the extent of its theatre holdings does not present a proper basis for criticism. Nor it is a relevant issue in these proceedings. Nor do American's television and motion picture production activities have any relevancy.

Additionally, Syufy seeks to raise issues based upon American's allegedly wrongful activities in other markets—New Orleans, San Francisco, Stockton, Atlanta, Chattanooga and Salt Lake City—and charges American with a competitive presence in Sacramento through covert arrangements with Cinerama, Inc. and with National General Corporation. Syufy has offered no persuasive proof of any of these charges. Indeed, there is none whatever with respect to the National General Corporation allegation. These charges are vigorously denied by American and the Attorney General has attributed no validity to them.

At the present time American has no theatres in Sacramento. Its nearest theatre is in Stockton, California, some forty miles to the south. Its alleged presence through Cinerama, Inc. is barely more than an unsupported assertion. Counsel for Syufy offered no proof of it upon the argument but has pressed the court for an order of production compelling the petitioner to produce a number of agreements between ABC and Cinerama, Inc., "whether or not currently in effect" and relating generally to the production and distribution of motion pictures in the United States. The state of the record is insufficient to warrant the discovery Syufy seeks. The court, under the circumstances, accepts the sworn statement of petitioner's General Attorney for Production Matters whose affidavit submitted upon these proceedings states unequivocally that there is no agreement written or oral, expressed or implied between Cinerama, Inc. and

American or any of their subsidiary corporations whereby "either party or their affiliates have any interest whatsoever, either in the operation or in the profits of any theatre served directly or indirectly by the other party or any of its affiliates either in Sacramento or elsewhere."

With respect to San Francisco, Syufy has filed a treble damage action in the United States District Court for the Northern District of California charging conspiracy to restrain and monopolize trade against a subsidiary of petitioner. An affidavit of Syufy's lawyer in that action, submitted by Syufy in these proceedings, also refers to antitrust litigation in the Eastern District of Louisiana in which a subsidiary of American was one of the defendants. This litigation, initiated in 1965, was terminated in 1970, in part by compromise and settlement during pendency of appeals, and in part by directed verdict against plaintiffs on the issue of damages. The issue of conspiracy was decided against the defendants. But what, if any, concrete result ensued from this verdict is not made clear. In any event, Syufy's attorney concedes that the judgment in the case, despite the finding of conspiracy, was for the defendants because of the directed verdict against plaintiffs on the issue of damages. This is the basis upon which Syufy charges petitioner with misconduct in the New Orleans market. It is difficult to discern any relevant relationship between the Louisiana litigation and the current proceedings.

Furthermore, Syufy's antitrust attorney is pressing another similar action against several motion picture exhibition circuits before the federal court in Sacramento, this time in behalf of another exhibitor whose partner has filed an affidavit here in support of Syufy's position.

This court has already had occasion to state that it can serve no useful purpose here "to reappraise cases where issues have been settled and quieted either by settlement or litigation." United States v. Warner Bros. Pictures Inc., 1964 Trade Cases ¶ 71,075. Similar-

ly, it would be unwise and impractical for this court to provide a litigant with an additional simultaneous forum for the appraisal of his contentions. *Cf.*, Klein v. Walston & Co., 432 F.2d 936, 937 (2d Cir. 1970) ; Milk Drivers and Dairy Employees Union Local v. Dairymen's League Co-Op Ass'n, 304 F.2d 913 (2d Cir. 1962).

This court has carefully examined the Syufy charge that the petitioner has violated a previous order of this court limiting first run playing time in Salt Lake City. It has concluded that the explicit provisions of the Salt Lake City order have been respected and that the charges in this respect are without basis in fact.

It would serve no useful purpose to follow the further digressions suggested by the voluminous Syufy papers. The charges of petitioner's alleged wrongdoing in widely dispersed geographical areas lack cogency and persuasiveness. Absent a sufficient showing of wrongdoing, it would not be consonant with the function of this court in these proceedings to permit them to become litigated issues here. As vindicator of the public interest, the Attorney General is charged with the duty of restraining violations of the antitrust laws. 15 U.S.C. § 4. He has not supported the charges of Syufy against the petitioner. Recourse to him can reasonably be expected to result in action in appropriate cases. And the private litigant is free to bring his own treble damage action just as Syufy has done in San Francisco, and another has done in Sacramento. The *amicus* here has availed himself of approaches to the Attorney General and to the courts in the past.

It follows, therefore, that there is insufficient proof before this court to warrant any enlargement of the sole issue before it—whether American's proposed acquisitions will unduly restrain competition in the Sacramento market for motion picture exhibition.

In this respect, and with only one reservation, the court believes that the position of the petitioner is valid and persuasive. The analysis of the relevant market area, as presented to the court by the Attorney General, has not been impugned. Most of the Syufy papers do not refer to it. And the position put forward by the petitioner does not differ markedly from that of the Government.

There is vigorous competition in the Sacramento market by numerous and effective competitors. There are thirty-eight theatres in Sacramento, nine of them drive-ins. Thus, the proposed theatres of American will constitute four of thirty-three conventional theatres. In terms of the number of theatres operated by a single exhibitor American will be exceeded by the seven theatres operated by United Artists and by the six theatres operated by Cinerama. It is possibly matched by the Lippert quadruplet theatres consisting of four auditoriums which have, however, a relatively small total seating capacity of twelve hundred.

But from the standpoint of the number of theatres operated on an exclusive first-run policy, American will have four of sixteen theatres. This amounts to an assumption of a twenty-five percent position by American. There is no other exhibitor in the Sacramento market operating more than three theatres on an exclusive first-run policy. While a comparison of exclusive first-run seating capacities would make American's position somewhat less impressive, the difference is not great enough to warrant a substantially different assessment of American's position. While agreeing with the Attorney General that American should be permitted to enter the market with at least three theatres, this court cannot agree that entry with four theatres should be without restriction. Accordingly, petitioner will be restricted to playing no more than 156 weeks of exclusive first-run of the major distributors in this market.

The affidavits of exhibitors who would like to preserve the status quo and who complain of poor business conditions in the market refer to matters which are alien to this court's functions. This

court has frequently stated that the Paramount decrees cannot serve established exhibitors as a shelter against competition by new arrivals. The overriding public interest is to foster and encourage competition. Any attempt to enforce competitive limitations designed to keep out a newly arrived competitor, or to prolong or insure the existence of an established enterprise, would tend to freeze into the market picture conditions of obsolescence, management and location, as well as the myriad factors that go to make up the characteristics of a competitor at a given time and place. Any such attempt, far from serving the public interest in competition, would eliminate the public benefits of competition. The stresses and strains of competition are intended to permit flexibility and improvements—a process that may well involve hardship for some while creating prosperity for others.

Upon all the relevant evidence it is this court's conclusion that the consolidated petitions should be granted, subject to the restrictions already indicated.

Submit order on notice consonant herewith.