NATIONAL ASSOCIATION FOR THE ADVANCE-
MENT OF COLORED PEOPLE, NEW YORK
CITY REGION OF NEW YORK CONFER-
ENCE OF BRANCHES, ET AL. *v.*
NEW YORK ET AL.

No. 72–129.  Argued February 27–28, 1973—Decided June 21, 1973

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., *post*, p. 369, and BRENNAN, J., *post*, p. 372, filed dissenting opinions. MARSHALL, J., took no part in the consideration or decision of the case.

*Jack Greenberg* argued the cause for appellants. With him on the briefs were *James M. Nabrit III, Eric Schnapper, Nathaniel R. Jones,* and *Wiley Branton.*

*A. Raymond Randolph, Jr.,* argued the cause for the United States. With him on the brief were *Solicitor General Griswold* and *Assistant Attorney General Norman. George D. Zuckerman,* Assistant Attorney General of New York, argued the cause for appellee the State of New York. With him on the brief were *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, *John G. Proudfit,* Assistant Attorney General, and *Judith T. Kramer,* Deputy Assistant Attorney General.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This appeal from a three-judge district court for the District of Columbia comes to us pursuant to the direct-review provisions of § 4 (a) of the Voting Rights Act of 1965, Pub. L. 89–110, 79 Stat. 438, as amended, 42 U. S. C. § 1973b (a).[1] The appellants[2] seek review of

---

[1] "To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made

an order dated April 13, 1972, unaccompanied by any opinion, denying their motion to intervene[3] in a suit that had been instituted against the United States by

under subsection (b) of this section or in any political subdivision with respect to which such determinations have been made as a separate unit, unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color . . . .

"An action pursuant to this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court. The court shall retain jurisdiction of any action pursuant to this subsection for five years after judgment and shall reopen the action upon motion of the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color.

"If the Attorney General determines that he has no reason to believe that any such test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color, he shall consent to the entry of such judgment."

[2] The appellants describe themselves, in their motion to intervene, as the National Association for the Advancement of Colored People, New York City Region of New York State Conference of Branches; four duly qualified black voters in Kings County, New York; and one duly qualified Puerto Rican voter in that county. Two of the individual appellants are also members of the New York State Assembly and another is a member of the New York State Senate. App. 44a.

[3] The motion, App. 44a–47a, does not differentiate between intervention of right and permissive intervention, under subdivisions (a) and (b), respectively, of Fed. Rule Civ. Proc. 24. Neither does it state that one, rather than the other, is claimed. At oral argument, counsel said that in the District Court the appellants sought intervention as of right. Tr. of Oral Arg. 8. In this Court appellants suggest that they were also entitled to permis-

the State of New York, on behalf of its counties of New York, Bronx, and Kings. New York's action was one for a judgment declaring that, during the 10 years preceding the filing of the suit, voter qualifications prescribed by the State had not been used by the three named counties "for the purpose or with the effect of denying or abridging the right to vote on account of race or color," within the language and meaning of § 4 (a), and that the provisions of §§ 4 and 5 of the Act, as amended, 42 U. S. C. §§ 1973b and 1973c, are, therefore, inapplicable to the three counties.

In addition to denying the appellants' motion to intervene, the District Court, by the same order, granted New York's motion for summary judgment. This was based upon a formal consent by the Assistant Attorney General in charge of the Civil Rights Division, on behalf of the United States, consistent with the Government's answer theretofore filed, "to the entry of a declaratory judgment under Section 4 (a) of the Voting Rights Act of 1965 (42 U. S. C. 1973b (a))," App. 39a. The consent was supported by an accompanying affidavit reciting, "I conclude, on behalf of the Acting Attorney General that there is no reason to believe that a literacy test has been used in the past 10 years in the counties of New York, Kings and Bronx with the purpose or effect of denying or abridging the right to vote on account of race or color, except for isolated instances which have been substantially corrected and which, under present practice cannot reoccur." App. 42a–43a.

Appellants contend here that their motion to intervene should have been granted because (1) the United States unjustifiably declined to oppose New York's mo-

sive intervention. Tr. of Oral Arg. 9; Brief for Appellants 26 n. 39. In view of our ruling on the issue of timeliness, we make no point of the distinction between the two types of intervention.

tion for summary judgment; (2) the appellants had initiated other litigation in the United States District Court for the Southern District of New York to compel compliance with §§ 4 and 5 of the Act; and (3) the appellants possessed "substantial documentary evidence," Jurisdictional Statement 7, to offer in opposition to the entry of the declaratory judgment.

Faced with the initial question whether this Court has jurisdiction, on direct appeal, to review the denial of the appellants' motion to intervene, we postponed determination of that issue to the hearing of the case on the merits.    409 U. S. 978.

## I

Section 2 of the Voting Rights Act of 1965, 42 U. S. C. § 1973,[4] clearly indicates that the purpose of the Act is to assist in the effectuation of the Fifteenth Amendment, even though that Amendment is self-executing, and to insure that no citizen's right to vote is denied or abridged on account of race or color. *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966); *Apache County* v. *United States,* 256 F. Supp. 903 (DC 1966).   Sections 4 and 5, 42 U. S. C. §§ 1973b and 1973c, are designed to prohibit the use of tests or devices, or the alteration of voting qualifications or procedures, when the effect is to deprive a citizen of his right to vote.   Section 4 (c) defines the phrase "test or device" to mean

> "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational

---

[4] "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color."

achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." 42 U. S. C. § 1973b (c).

Section 4 (b), as amended, now applies in any State or in any political subdivision of a State which the Attorney General determines maintained on November 1, 1964, or November 1, 1968, any "test or device," and with respect to which the Director of the Bureau of the Census determines that less than half the residents of voting age there were registered on the specified date, or that less than half of such persons voted in the presidential election of that November. These determinations are effective upon publication in the Federal Register and are not reviewable in any court. 42 U. S. C. § 1973b (b).

The prescribed publication in the Federal Register suspends the effectiveness of the test or device, and it may not then be utilized unless a three-judge district court for the District of Columbia determines, by declaratory judgment, that no such test or device has been used during the 10 years preceding the filing of the action "for the purpose or with the effect of denying or abridging the right to vote on account of race or color." § 4 (a), 42 U. S. C. § 1973b (a). The same section states that "any appeal shall lie to the Supreme Court." And the District Court "shall retain jurisdiction of any action pursuant to this subsection for five years after judgment and shall reopen the action upon motion of the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color."

Section 5, 42 U. S. C. § 1973c, applies whenever a State or political subdivision with respect to which a determination has been made under § 4 (b) "shall enact

or seek to administer any voting qualification or pre-requisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect" on November 1, 1964, or November 1, 1968.[5]   The State or political subdivision may then institute an action in the United States District Court for the District of Columbia for a declaratory judgment that what was done "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color."   Unless and until the court enters such judgment "no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure."   The statute contains a proviso, however, that the change may be enforced without the court proceeding if it has been submitted to the Attorney General of the United States and he "has not interposed an objection within sixty days after such submission."   Neither the Attorney General's failure to object nor a declaratory judgment entered under § 5 shall bar a subsequent action by a private party to enjoin enforcement of the change.   Here again, the action shall be determined by a three-judge court "and any appeal shall lie to the Supreme Court."

## II

On July 31, 1970, the Attorney General filed with the Federal Register his determination that New York on November 1, 1968, maintained a test or device as defined in § 4 (c) of the Act.   This was published the following day.   35 Fed. Reg. 12354.   On March 27, 1971, there was published in the Federal Register the determination

---

[5] In *Georgia* v. *United States*, 411 U. S. 526 (1973), the Court held that a State's reapportionment plan, which has the potential for diluting Negro voting power, is a "standard, practice, or procedure with respect to voting," within the meaning of § 5 of the Act.   See *Allen* v. *State Board of Elections*, 393 U. S. 544 (1969).

by the Director of the Bureau of the Census that in the counties of Bronx, Kings, and New York, in the State of New York, "less than 50 per centum of the persons of voting age residing therein voted in the presidential election of November 1968." 36 Fed. Reg. 5809.

The present action was instituted by the State of New York with the filing of its original complaint on December 3, 1971, in the United States District Court for the District of Columbia. The appellants contend that the District Court's order denying them intervention in that action is directly appealable to this Court under § 4 (a) of the Act.

The United States "substantially" agrees that this Court has jurisdiction to review on direct appeal the denial of intervention in an action of this kind.[6] Brief for United States 21 n. 15. New York suggests that the appeal should be dismissed because the appellants have not established intervention as of right and have not demonstrated an abuse of discretion by the District Court in denying permissive intervention. Brief for Appellee 22–23. We must determine for ourselves, of course, the scope of our jurisdiction, since "jurisdiction of the federal courts—their power to adjudicate—is a grant of authority to them by Congress and thus beyond the scope of litigants to confer." *Neirbo Co.* v. *Bethlehem Corp.*, 308 U. S. 165, 167 (1939); *Mitchell* v. *Maurer*, 293 U. S. 237, 244 (1934).

The jurisdictional issue is simply phrased: whether "any appeal," within the language of the second paragraph of § 4 (a), includes an appeal by a would-be, but unsuccessful, intervenor. Certainly, the words "any appeal" are subject to broad construction; they could be said to include review of any meaningful judicial determi-

---

[6] But see Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 2, pp. 90–91 (1965).

nation made in the progress of the § 4 lawsuit. That Congress intended a broad meaning is apparent from its expressed concern that voting restraints on account of race or color should be removed as quickly as possible in order to "open the door to the exercise of constitutional rights conferred almost a century ago." H. R. Rep. No. 439, 89th Cong., 1st Sess., 11 (1965). See S. Rep. No. 162, pt. 3, 89th Cong., 1st Sess., 6–7 (1965). Indeed, the Voting Rights Act of 1965 was an addition to, and buttressed, § 2004 of the Revised Statutes, as that section had been amended by the respective Civil Rights Acts of 1957, 1960, and 1964, 71 Stat. 637, 74 Stat. 90, and 78 Stat. 241, codified as 42 U. S. C. § 1971. When the 1965 Act was under consideration by the Congress, § 1971 (c) already empowered the Attorney General to institute a civil action to protect the right to vote from deprivation because of race or color or from interference by threat, coercion, or intimidation. Section 1971 (g) further provided that, in such a suit, the Attorney General could request a three-judge court, and "it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date . . . and to cause the case to be in every way expedited." Further, an appeal from the final judgment of that court was to the Supreme Court.

Despite this existing statutory provision designed to hasten the removal of barriers to the right to vote, the Congress determined, in 1965, that the enforcement of the voting rights statutes "has encountered serious obstacles in various regions of the country," and progress "has been painfully slow, in part because of the intransigence of State and local officials and repeated delays in the judicial process." H. R. Rep. No. 439, *supra,* at 9. See *South Carolina* v. *Katzenbach,* 383 U. S., at 309–315, and *Allen* v. *State Board of Elections,* 393 U. S. 544, 556 n. 21 (1969). Congress thus produced

the Voting Rights Act of 1965 in response to this recognized problem and provided in that Act that "any appeal" in a § 4 (a) three-judge proceeding shall lie to this Court. This contrasts with the language in the earlier theretofore existing statute providing for an appeal here only "from the final judgment" of the three-judge court. § 1971 (g). The broader language of § 4 (a), when viewed in the light of Congress' concern about hastening the resolution of suits involving voting rights, see *Apache County* v. *United States,* 256 F. Supp., at 907, prompts us to conclude that the unsuccessful intervenor's § 4 (a) appeal is directly here and not to the Court of Appeals.

This conclusion is not without other relevant statutory precedent. It has long been settled that an unsuccessful intervenor in a government-initiated civil antitrust action may appeal directly to this Court under § 2 of the Expediting Act, 15 U. S. C. § 29.[7] *United States* v. *California Canneries,* 279 U. S. 553, 559 (1929); *Sutphen Estates* v. *United States,* 342 U. S. 19, 20 (1951); *Cascade Natural Gas Corp.* v. *El Paso Natural Gas Co.,* 386 U. S. 129, 132 (1967).

Earlier this Term, in *Tidewater Oil Co.* v. *United States,* 409 U. S. 151 (1972), we held that § 2 of the Expediting Act lodged in this Court exclusive appellate jurisdiction over interlocutory, as well as final, orders in Government civil antitrust cases. In so holding, we emphasized Congress' determination "to speed appellate review." *Id.,* at 155. As we have noted above, Congress has expressed a similar need for speed in adjudicating voting rights cases. We could not justify dissimilar treatment to an unsuccessful intervenor under the parallel § 4 (a) of the Civil Rights Act.

---

[7] "In every civil action brought in any district court of the United States under any of said Acts, wherein the United States is complainant, an appeal from the final judgment of the district court will lie only to the Supreme Court."

Further support for this result is supplied when one contrasts the specific appeal provision of § 4 (a) with 28 U. S. C. § 1253,[8] allowing for a direct appeal to this Court from an order granting or denying an interlocutory or permanent injunction "in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges." That section provides that "any party" may appeal here except "as otherwise provided by law." Section 4 (a) does not incorporate or refer to § 1253. The former relates to "any appeal"; the latter speaks only of "any party." The difference is obvious, and the broader purport of Congress under § 4 (a) is manifest.

We conclude, therefore, that this Court has jurisdiction, on direct appeal by one denied intervention in a § 4 (a) action, to determine whether the District Court erred in denying the motion to intervene.

### III

As originally enacted, §§ 4 and 5 of the Voting Rights Act of 1965 related only to a period of five preceding years, to a test or device in effect on November 1, 1964, to a paucity of persons registered on that date, and to a paucity of voters in the presidential election of 1964. 79 Stat. 438, 439. In 1970, however, Congress enacted the Voting Rights Act Amendments of 1970. Pub. L. 91–285, 84 Stat. 314. This new legislation, among other things, related §§ 4 and 5 to ten, rather than five, preceding years and, in addition to the November 1, 1964, date and the presidential election of that year, to No-

---

[8] "Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges."

vember 1, 1968, and the 1968 election. Also, the 1970 Act suspended the use of any test or device "in any Federal, State, or local election" prior to August 6, 1975, without regard to whether a determination has been made that § 4 covered a particular State or political subdivision. 42 U. S. C. § 1973aa. See *Oregon* v. *Mitchell,* 400 U. S. 112, 131–132 (1970) (opinion of Black, J.).

The three New York counties that the present litigation concerns were not covered by §§ 4 and 5 of the original 1965 Act. They became subject thereto because of the provisions of the 1970 Act and the respective published determinations, hereinabove described, of the Attorney General and the Director of the Bureau of the Census. Indeed, it is clear that the three counties were a definite target of the 1970 amendments. See, *e. g.,* 116 Cong. Rec. 6659 (1970) (remarks of Sen. Cooper), *id.,* at 20161 and 20165 (remarks of Congs. Celler and Albert, respectively).

It was in December 1971, during the pendency of state legislative proceedings for the redrafting of congressional and state senate and assembly district lines,[9] that the State of New York filed its complaint in the present

---

[9] Although the Director of the Bureau of the Census determined, on March 15, 1971, that less than 50% of the persons of voting age residing in the three named New York counties voted in the presidential election of November 1968, it was stated on behalf of the appellees in oral argument that a complete set of census statistics was not available to the State of New York until October 15, 1971. Tr. of Oral Arg. 41. The appellants, however, in the complaint filed by them in the United States District Court for the Southern District of New York in their § 5 suit against the New York City Board of Elections and others, No. 72 Civ. 1460, alleged that census information on which reapportionment was based was made available to the State no later than September 1, 1971. App. 59a. We do not know which of these dates is correct. It is clear, in any event, that census data for the redrawing of congressional and legislative district lines was not available to New York until the fall of 1971.

action.[10]   The amended complaint, filed 13 days later, alleged that certain of the State's qualifications for registration and voting, prescribed by New York's Constitution, Art. II, § 1, and by its Election Law, §§ 150 and 168, as amended (the ability to read and write English, the administration of a literacy test, and the presentation of evidence of literacy in lieu of the test), had not been used during the preceding 10 years "for the purpose or with the effect of denying or abridging the right to vote on account of race or color," App. 6a; that the State's literacy requirements were suspended in 1970 and remained suspended; that after enactment of the 1965 Act, the New York City Board of Elections provided English-Spanish affidavits to be executed in lieu of a diploma or certificate in conformity with the requirements of the Act; and that, beginning in 1964 and continuing through 1971, with the exception of 1967, there were voter registration drives every summer designed to increase the number of registered voters in the three named counties.

New York and the United States stipulated that the Government could file its answer or other pleading by March 10, 1972.   The answer was filed on that day.   The Government therein admitted that English-Spanish affidavits were provided by the City Board of Elections but averred, on information and belief, that such affidavits

---

[10] New York claims that the primary reason for filing its § 4 (a) suit was to insure that the imminent 1972 elections would be held on the basis of district lines drawn according to population figures from the 1970 census.   It is said that the lateness in obtaining the figures, see n. 9, *supra*, and the concomitant impossibility of redrawing lines before early 1972 made it highly unlikely that the State would be able to obtain from the Attorney General of the United States any § 5 clearance for the redistricting legislation prior to April 4, the first day for circulating nominating petitions for the June 20 primary.   Thus, by obtaining a favorable result in a § 4 (a) suit, New York could bypass the submission of its redistricting plan to the Attorney General.   Tr. of Oral Arg. 41–42.

were not so provided prior to 1967. The answer also alleged that the United States was without knowledge or information sufficient to form a belief as to the truth of the plaintiff's allegation that the literacy tests were administered with no intention or effect to abridge or deny the right to vote on the basis of race or color.

On March 17 New York filed its motion for summary judgment. This was supported by affidavits from the Administrator for the Board of Elections in the City of New York "which includes the counties of New York, Bronx and Kings," the Chief of the Bureau of Elementary and Secondary Educational Testing of the New York State Education Department, and the respective Chief Clerks of the New York, Bronx, and Brooklyn Borough Offices of the New York City Board of Elections. App. 15a–32a. These affidavits stated that those instances where the suspension of literary tests had been ignored or overlooked by election officials were isolated and that steps had been taken to resolve that problem. The affidavits also stated that since 1964, with the exception of 1967, the Board of Elections had conducted summer voter-registration drives directed particularly to high-density black population areas. In its memorandum, filed with the District Court, in support of its motion, New York presented a history of its use of literacy tests [11] and concluded, "[s]ince it was never the practice of administering the tests to discriminate against any person on account

---

[11] The New York Election Law, § 168, as amended, provides that "a new voter may present as evidence of literacy" a certificate that he has completed the sixth grade of an approved elementary school or of a school "accredited by the Commonwealth of Puerto Rico in which school instruction is carried on predominately in the English language." On July 28, 1966, the State's Attorney General issued an opinion to the effect that New York may not require literacy in English from persons educated in Puerto Rico. Op. Atty. Gen. N. Y., 1966, pp. 121, 123.

of race or color, and since the filing requirements of the Voting Rights Act are leading to delays which may well disrupt the political process in New York, this action for declaratory judgment has been brought." Memorandum 4–5. See *South Carolina* v. *Katzenbach,* 383 U. S., at 332.

Two and one-half weeks later, on April 3, the United States filed its formal consent, hereinabove described, to the entry of the declaratory judgment for which New York had moved. The accompanying affidavit of the Assistant Attorney General stated that the Department of Justice had conducted "an investigation which consisted of examination of registration records in selected precincts in each covered county, interviews of certain election and registration officials and interviews of persons familiar with registration activity in black and Puerto Rican neighborhoods in those counties." App. 40a. The Assistant Attorney General then reached the conclusion, App. 42a–43a, quoted *supra,* at 349.

Appellants' motion to intervene was filed April 7. Appellants asserted that if New York were successful in the present action, the appellants would be deprived of the protections afforded by §§ 4 and 5; that they "would be legally bound" thereby in their simultaneously filed § 5 action in the Southern District of New York; and that the latter action "would necessarily fail." App. 45a.[12]

---

[12] While the present case was pending in the District Court, the New York Legislature on January 14, 1972, completed its work of redrawing assembly and senate district lines and enacted legislation altering those boundaries. N. Y. Laws 1972, c. 11. On January 24, the State's Attorney General submitted the redistricting plan to the Attorney General of the United States pursuant to § 5 of the 1965 Act, as amended, 42 U. S. C. § 1973c. On March 14, three days before New York's motion for summary judgment was filed, the United States Attorney General rejected New York's submission on the ground that it was lacking in information required by the applicable regulations set forth at 36 Fed. Reg. 18186–18190 (1971). On March 28

The appellants also alleged that the § 5 suit asserted that New York "has gerrymandered Assembly, Senatorial and Congressional districts in Kings, Bronx and New York counties so that, on purpose and in effect, the right to vote will be denied on account of race or color." *Ibid.* Thus, it was said, the disposition of the present suit might impair or impede the appellants' ability to protect their interests in registering to vote, voting, and seeking public office. App. 46a. It was further claimed that during the preceding three weeks attorneys in the Department of Justice thrice had represented to appellants' counsel that the United States would oppose New York's motion for summary judgment.[13] "At no time did any of the three Justice Department attorneys . . . inquire of counsel for [appellants] whether he or any of the [appellants] had information or evidence which would support the government's alleged position that sections 4 and 5 of the Voting Rights Act should continue to be applied to Kings, Bronx and New York counties." *Ibid.*

There was also filed an affidavit of Eric Schnapper, one of the attorneys for the appellants. This repeated the allegations contained in the motion to intervene and also asserted that on March 21 the affiant advised a Department of Justice attorney that when the New York redistricting laws were submitted to the Department, he wished to submit material and arguments in opposition to their approval; that on March 23 he was advised by another Department attorney that papers were being

the New York Legislature enacted legislation redefining the boundaries of the State's congressional districts. N. Y. Laws 1972, c. 76. The congressional changes were not submitted for approval under § 5.

[13] The United States takes the position "that the statements of appellants' counsel are not an accurate representation of the conversations between him and these government attorneys." Brief for United States 47.

prepared in opposition to New York's motion for summary judgment; that he informed the attorney that the appellants were considering the institution of an action in the Southern District of New York; that on April 3 he was advised by the Department of Justice that it would have no objection to the institution of the New York suit; and that in the afternoon of April 5 he was informed by telephone for the first time that two days earlier the United States had consented to New York's motion for summary judgment. App. 48a–51a.

With the motion to intervene the appellants filed a proposed answer to appellees' amended complaint and a brief memorandum of points and authorities. The latter suggested the failure of the Attorney General "to investigate the relevant facts," namely, "whether there are differences in the literacy rates of whites and non-whites, particularly if they are do [sic] to unequal or discriminatory public education. *Gaston County* v. *United States,* 395 U. S. 285 (1969)." This suggestion was also made in the proposed answer. App. 65a–66a.

The United States took no position with respect to the appellants' motion to intervene. New York opposed the motion on six grounds. The first was untimeliness in that the suit had been pending for more than four months, an article about it had appeared in early February in the New York Times, and the appellants did not deny that they had knowledge of the pendency of the action. The second was failure to allege appropriate supporting facts. The third was the lack of a requisite interest in that none of the appellants asserted he was a victim of discriminatory application of the literacy test; rather, the motion to intervene was subordinate to the appellants' real interest in invalidating New York's reapportionment of its assembly, senate, and congressional districts, as evidenced by the institution of their action in the Southern District of New York. The fourth

was adequate representation of the appellants' interest by the United States. The fifth was that delay in the granting of the motion for summary judgment would prejudice New York and jeopardize the impending primary elections for offices of Assembly, Senate, and Congress, as well as for delegates to the upcoming Democratic National Convention. The sixth was that the appellants and others who claimed discrimination still could raise those issues in the state and federal courts of New York. Plaintiff's Memorandum of Law in Opposition to the Motion to Intervene 1–8. Like reasons were asserted in a supporting affidavit of an Assistant New York Attorney General. App. 67a–70a.

On April 13 the three-judge court entered its order denying the appellants' motion to intervene and granting summary judgment for New York. App. 71a–72a.

On April 24 the appellants filed a motion to alter judgment on the ground, among others, that their motion to intervene was timely since neither the appellants nor their counsel knew of the § 4 (a) action until March 21.[14] The appellants now asserted that evidence was available to demonstrate that in the three counties education af-

---

[14] Mr. Schnapper filed a further affidavit on April 24, 1972. In it he stated (1) that prior to March 21, 1972, he had no knowledge whatever of the commencement, pendency, or existence of the § 4 (a) action; (2) that throughout December 1971 and January and February 1972 he was in New Hampshire and the daily paper he regularly read there did not carry any story about the present suit; (3) that to the best of his knowledge neither co-counsel nor any of the appellants knew of the suit prior to March 21; (4) that he did not receive New York's memorandum in opposition to the motion to intervene until April 13, after the District Court already had ruled on the motion; (5) that he did not learn of the consent by the United States to the entry of judgment until April 5; and (6) that the motion to intervene, as well as the papers in the § 5 action in the Southern District of New York, was drafted "throughout the night of April 6–7." App. 91a–92a.

forded nonwhite children by New York was substantially inferior to that afforded white children and that "this difference resulted in disparities in white and non-white illiteracy rates among persons otherwise eligible to vote in those counties during the 10 years prior to the filing of the instant action." App. 73a–74a. Thus "a full evidentiary hearing is required before making any finding of fact as to whether plaintiff's literacy tests discriminated on the basis of race." Finally, the appellants asserted that the District Court "should not have approved the consent judgment desired by plaintiff and defendant without first soliciting the intervention of responsible interested parties and requiring the United States to undertake a more thorough investigation of the relevant facts." *Ibid.*

The District Court promptly denied the Motion to Alter Judgment. App. 117a.

Subsequently, while the appeal was pending in this Court, two additional facts came to light and are authorized by the parties for our consideration. The first is that Mr. Schnapper, who executed the above-described affidavits, did not begin his employment as an attorney with the NAACP Legal Defense and Education Fund, Inc., until March 9, 1972. The second is that "Justice Department attorneys met with appellants Stewart and Fortune in January 1972 during the course of their investigation; although the Justice Department attorneys recall informing Stewart and Fortune that this case was pending, neither Stewart nor Fortune can remember being so informed." Reply Brief for Appellants 3 n. 1; Brief for United States 36.

## IV

The foregoing detailed recital of the facts and of the history of the case is necessary because of the discretionary nature of the District Court's order we are called upon to review. Our task is to determine whether, upon

the facts available to it at that time, the court erred in denying the appellants' motion to intervene.

Intervention in a federal court suit is governed by Fed. Rule Civ. Proc. 24.[15] Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24 (a) and Rule 24 (b), that the application must be "timely." If it is untimely, intervention must be denied. Thus, the court where the action is pending must first be satisfied as to timeliness.[16] Although the point to which

---

[15] "Rule 24.—INTERVENTION

"(a) Intervention of right.

"Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

"(b) Permissive intervention.

"Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

[16] *Iowa State University Research Foundation* v. *Honeywell, Inc.,* 459 F. 2d 447, 449 (CA8 1972); *Smith Petroleum Service, Inc.* v. *Monsanto Chemical Co.,* 420 F. 2d 1103, 1115 (CA5 1970); *Lumbermens Mutual Casualty Co.* v. *Rhodes,* 403 F. 2d 2, 5 (CA10), cert. denied, 394 U. S. 965 (1969); *Kozak* v. *Wells,* 278 F. 2d 104, 108–109 (CA8 1960); 7A C. Wright & A. Miller, Federal Practice and Pro-

the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive. Timeliness is to be determined from all the circumstances.[17] And it is to be determined by the court in the exercise of its sound discretion; unless that discretion is abused, the court's ruling will not be disturbed on review.[18]

With these accepted principles in mind, we readily conclude that the District Court's denial of the appellants' motion to intervene was proper because of the motion's untimeliness, and that the denial was not an abuse of the court's discretion:

1. The court could reasonably have concluded that appellants knew or should have known of the pendency of the § 4 (a) action because of an informative February article in the New York Times discussing the controversial aspect of the suit; [19] public comment by community leaders; the size and astuteness of the membership and staff of the organizational appellant; and the ques-

---

cedure § 1916 (1972); 3B J. Moore, Federal Practice ¶ 24.13 [1] (2d. ed. 1969).

[17] *Iowa State University Research Foundation v. Honeywell, Inc.,* 459 F. 2d, at 449; *Smith Petroleum Service, Inc.* v. *Monsanto Chemical Co.,* 420 F. 2d, at 1115; *Kozak v. Wells,* 278 F. 2d, at 109.

[18] *McDonald* v. *E. J. Lavino Co.,* 430 F. 2d 1065, 1071 (CA5 1970); *Lumbermens Mutual Casualty Co.* v. *Rhodes,* 403 F. 2d, at 5; 3B J. Moore, Federal Practice ¶ 24.13, p. 24–524.

[19] The New York Times, Feb. 6, 1972, p. 48. This was the only news article on the page. Its three-column headline read, "Lefkowitz Acts to Bar Voting Watch." The article recited that New York's Attorney General "had moved in Federal Court in Washington to have the state exempted from potential Federal supervision over registration and voting" in the three counties. It mentioned an attack upon the suit by the Chairman of the Citizens Voter Education Committee, a Congressman, and the Manhattan and Bronx Borough Presidents, and described the Attorney General's reply to that attack.

tioning of two of the individual appellants themselves by Department of Justice attorneys investigating the use of literacy tests in New York.

2. We, however, need not confine our evaluation of abuse of discretion to the facts just mentioned, for the record amply demonstrates that appellants failed to protect their interest in a timely fashion after March 21, 1972, the date they allegedly were first informed of the pendency of the action. At that point, the suit was over three months old and had reached a critical stage. The United States had answered New York's complaint on March 10 and in that answer had clearly indicated that it was without knowledge or information sufficient to form a belief as to the truth of New York's allegation that the State's literacy tests were administered without regard to race or color. App. 13a. New York, in reliance upon this answer, then filed its motion for summary judgment. The only step remaining was for the United States either to oppose or to consent to the entry of summary judgment. This was the status of the suit at the time the appellants concede they were aware of its existence. It was obvious that there was a strong likelihood that the United States would consent to the entry of judgment since its answer revealed that it was without information with which it could oppose the motion for summary judgment. Thus, it was incumbent upon the appellants, at that stage of the proceedings, to take immediate affirmative steps to protect their interests either by supplying the Department of Justice with any information they possessed concerning the employment of literacy tests in a way designed to deny New York citizens of the right to vote on account of race or color, or by presenting that information to the District Court itself by way of an immediate motion to intervene.[20] Appel-

---

[20] See Hearings on H. R. 6400 before Subcommittee No. 5 of the

lants failed to take either of these affirmative steps. They chose, rather, to rely on representations said to have been made by Department of Justice attorneys during the course of telephone conversations. The content of the representations allegedly made by the attorneys is a matter of dispute. Brief for United States 46–47. Indeed, it appears from the affidavit filed by appellants' counsel in support of the motion to alter judgment that appellants were not preparing, prior to the "night of April 6–7," to file a motion to intervene or even to file their New York federal action seeking to enjoin the 1972 elections. See n. 14, *supra*.

3. It is also apparent that there were no unusual circumstances warranting intervention since (a) no appellant alleged an injury, personal to him, resulting from the discriminatory use of a literacy test, (b) appellants' claim of inadequate representation by the United States was unsubstantiated, (c) appellants would not be foreclosed from challenging congressional and state legislative redistricting plans on the grounds that they were the product of improper racial gerrymandering, cf. *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960), and *Wright* v. *Rockefeller,* 376 U. S. 52 (1964), (d) appellants were free to renew their motion to intervene following the entry of summary judgment since the District Court was required, under § 4 (a) of the Act, 42 U. S. C. § 1973b (a), to retain jurisdiction for five years after judgment, and, (e) in any event, no citizen of New York could be denied the right to vote in the near future since all literacy tests

---

House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 2, pp. 91–93.

Appellants at oral argument acknowledged that they were not precluded from seeking intervention prior to the date on which the United States filed its consent to the entry of summary judgment. Tr. of Oral Arg. 18–19.

have been suspended until August 6, 1975.    42 U. S. C. § 1973aa.

4. Finally, in view of the then rapidly approaching primary elections in New York and of the final date for filing nominating petitions to participate in those elections, the granting of a motion to intervene possessed the potential for seriously disrupting the State's electoral process with the result that primary and general elections would then have been based on population figures from the 1960 census and more than 10 years old.

We therefore conclude that the motion to intervene was untimely and that the District Court did not abuse its discretion in denying the appellants' motion.    See *Apache County* v. *United States*, 256 F. Supp. 903 (DC 1966); *United States* v. *Paramount Pictures, Inc.*, 333 F. Supp. 1100 (SDNY), aff'd *sub nom. Syufy Enterprises* v. *United States*, 404 U. S. 802 (1971).    This makes it unnecessary for us to consider whether other conditions for intervention under Rule 24 were satisfied.

*Affirmed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

When two mighty political agencies such as the Department of Justice in Washington, D. C., and the Attorney General of New York in Albany agree that there is no racial discrimination in voting in three New York counties although the historic record [1] suggests it, it

---

[1] The Attorney General of New York protests this statement.    But the 90-year-long segregated school system of last century is not the point; the reference is to the offer of proof made by the appellants. The Attorney General also states that the federal investigation showed that the inference has no basis in fact.    He asserts moreover that New York's literacy requirement has no racial cast in

is time to take a careful look and not let this litigation be ended by an agreement between friendly political allies.

The Voting Rights Act Amendments of 1970 were specifically aimed at New York—particularly Bronx, Kings, and New York Counties. It was pointed out in the debates that under the earlier Act these counties were not included, that while in the 1964 election more than 50% of the voters were registered and more than 50% voted, in the 1968 election 50% were not registered or voting. 116 Cong. Rec. 6654, 6659. It was pointed out that New York's literacy requirement was enacted with the view of discriminating on the basis of race. *Id.,* at 6660. New York blacks were illiterate because their education, if any, had been in second-class schools elsewhere. *Id.,* at 6661. It was emphasized that wherever the blacks had been educated it was unconstitutional to discriminate against them on the basis of race even though illiterate. *Id.,* at 5533. The use of literacy tests in New York tended to deter blacks from registering, it was said. *Ibid.* And it was pointed out that literacy tests had a greater impact on blacks and other minorities than on any white because literacy was higher among whites. *Id.,* at 5532–5549.

In the face of this history, the United States did not call one witness or submit a single document or make even a feeble protest to New York's claim that it was lily-white. The United States has no defense to offer. The desultory way in which the United States acted is illustrated by the fact that although the Act requires

practice. But appellants' offer of proof is disturbing to say the least. The case was disposed of on a motion for summary judgment. The case is in my view a classic example of the inappropriateness of such a procedure. As I state in my dissent, a hearing should have been held and findings of fact made.

the District Court to retain jurisdiction of the cause for five years, 42 U. S. C. § 1973b (a), the United States did not even make the request. It capitulated completely. And yet the blacks, the Americans of Puerto Rican ancestry, and other minorities victimized by illiteracy tests clamor in their way for representation. Only NAACP offers it in this case. The investigation made by the Department of Justice has all the earmarks of a whitewash.

The Attorney General had testified before Congress: [2]

> "[I]t is clear that Negro voting in most Deep South Counties subjected to both literacy test suspension and on-scene enrollment by Federal registrars is now *higher* than Negro vote participation in the ghettos of the two Northern cities—New York and Los Angeles—where literacy tests are still in use. In non-literacy test Northern jurisdictions like Chicago, Cleveland and Philadelphia, Negro registration and voting ratios are higher than in Los Angeles and (especially) New York. . . ."

Yet, none of these assertions were given the District Court nor was any attempt made to develop evidence along these lines.

This suit by the State of New York to get an exemption for the three counties started on December 3, 1971. On March 10, 1972, the United States filed its answer and on March 17, 1972, New York moved for summary judgment. On March 21, 1972, NAACP was advised by the Department of Justice that the latter would oppose New York's motion for summary judgment. Out of the blue the Department of Justice on April 4, 1972, consented to the entry of a decree exempting the three New

---

[2] Hearings on H. R. 4249, etc., before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., ser. 3, p. 296 (1969).

York counties from the Act. The motion to intervene was promptly filed April 7, 1972.

The answer filed by NAACP on April 7, 1972, alleges that the literacy test administered by New York deterred minorities from registering, that it was administered by whites, that social gerrymandering was so widespread and successful that minorities were discouraged from voting, and that New York produced illiterate blacks through operating inferior black schools—inferior in educational facilities, inferior in teachers, and inferior in expenditures *per capita*.

It is assumed, of course, that the United States adequately represents the public interest in cases of this sort. But on the face of this record of transactions that the United States has approved or does not contest, it is clear that it does not adequately represent the public interest. Intervention as of right under Rule 24 (a)(2) should therefore be allowed. See *Cascade Natural Gas Corp.* v. *El Paso Natural Gas Co.*, 386 U. S. 129, 135–136.

Here it is plainly evident that the United States is an eager and willing partner with its allies in New York to foreclose inquiry into barriers to minority voting. What the facts may produce, no one knows. All that is requested is a hearing on the merits. The fresh air of publicity that only a fair and full trial in court can produce should be allowed to ventilate a case that has all the earmarks of a cozy arrangement to suppress the facts—evidence which, if proved, would be adequate as a basis for relief in a case from the South. See *Gaston County* v. *United States*, 395 U. S. 285. This evidence, if proved, should be equally adequate in the North.

MR. JUSTICE BRENNAN, dissenting.

In my view, the District Court erred in denying appellants' motion for leave to intervene in this suit under § 4 (a) of the Voting Rights Act of 1965, as amended, 42

U. S. C. § 1973b (a). The case plainly turns on its facts, and its impact on the development of principles governing intervention will doubtless be small. But what is ultimately at stake in this suit by New York to obtain an exemption under the Voting Rights Act is the applicability of the protections of the Act to 2.2 million minority-group members residing in three New York counties. According to appellants, the total number of minority-group members affected by all previous exemptions combined was less than 100,000.

At the same time that the District Court denied the motion to intervene, it granted the State's motion for summary judgment, thereby exempting these three counties from the coverage of the Act. The United States, defendant in the suit, consented to the entry of summary judgment. As a result, the contention that appellants were prepared to urge—namely, that the grant of an exemption would nullify the specific congressional intent to extend the protections of the Act to the class represented by appellants—was never laid before the Court.

In upholding the denial of leave to intervene, the Court reasons that appellants' motion, filed four days after the United States consented to a grant of summary judgment, was untimely. In the Court's view, appellants should have made their motion during the brief period between the filing of New York's motion for summary judgment and the announcement by the United States that it would not contest that motion. The Court states, with the benefit of hindsight, that it was

> "obvious that there was a strong likelihood that the United States would consent to the entry of judgment since its answer revealed that it was without information with which it could oppose the motion for summary judgment. Thus, it was in-

cumbent upon the appellants, at that stage of the proceedings, to take immediate affirmative steps to protect their interests either by supplying the Department of Justice with any information they possessed concerning the employment of literacy tests in a way designed to deny New York citizens of the right to vote on account of race or color, or by presenting that information to the District Court itself by way of an immediate motion to intervene." *Ante,* at 367.

The timeliness of a motion to intervene is determined, not by reference to the date on which the suit began or the date on which the would-be intervenors learned that it was pending, but rather by reference to the date when the movants learned that intervention was needed to protect their interests. See *Diaz* v. *Southern Drilling Corp.,* 427 F. 2d 1118, 1125 (CA5 1970); cf. *Cascade Natural Gas Corp.* v. *El Paso Natural Gas Co.,* 386 U. S. 129 (1967). Prior to the announcement that the United States would not contest the motion for summary judgment, appellants could not have known that intervention was needed to protect their interests and the interests of the class they represent. In an affidavit filed in connection with the motion to intervene, appellants' attorney stated that he had been advised by three different Justice Department attorneys that the United States would oppose New York's motion for summary judgment. App. 48a–51a. The Court suggests that the contents of the representations made by these attorneys is "a matter of dispute." *Ante,* at 368. The matter was not in dispute, however, at the time the affidavit was filed,* nor did it become the subject of dispute until five months later

---

*"The United States filed no response to appellants' motion to intervene and did not otherwise object to the motion." Brief for United States 10.

when the Government filed in this Court its Motion to Dismiss or Affirm. Even then, the United States did not deny that appellants had been offered certain assurances by Government attorneys, but stated only that the affidavit was not "an accurate representation of the substance of the conversations between counsel for appellants and attorneys for the government." Motion to Dismiss or Affirm, filed Sept. 13, 1972, p. 4 n. 3.

Thus, the record before the District Court indicated reasonable reliance on the Government's assurances that the suit would not be settled. And appellants did move to intervene within four days of learning that they could no longer rely on the Government to protect their interests. On that record, the District Court was obligated to conclude that the motion was timely filed. Since the allegation of untimeliness was, in my view, the only non-frivolous objection to the motion, the District Court's denial of the motion was unquestionably erroneous. I dissent.