**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**CITY OF CHICAGO,**
**Defendant-Appellee.**

**Appeal of Pete O'SULLIVAN, et al.,**
**Petitioning-Intervenors.**

**No. 85–2245.**

United States Court of Appeals,
Seventh Circuit.

Argued May 6, 1986.

Decided Aug. 14, 1986.

Rehearing and Rehearing En Banc
Denied Sept. 26, 1986.

Lynn K. Mitchell, Corp. Counsel, Chicago, Ill., for City of Chicago.

William F. Fitzpatrick, Callahan Fitzpatrick Hirst & Lakoma, Oak Lawn, Ill., for petitioning-intervenors.

Before CUDAHY and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Pete O'Sullivan and fourteen other white candidates for firefighter positions with the City of Chicago (the "Applicants") appeal from an order of the district court denying them leave to intervene in this lawsuit. We affirm.

I

This lawsuit was commenced in 1973, when the United States filed a complaint against the City of Chicago (the "City"), alleging that it was engaged in a pattern or practice of racial discrimination with respect to recruitment, hiring and promotion in the Chicago Fire Department, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Specifically, the United States contended that the City was using "qualifications, tests, and other selection standards as part of the initial hiring process" that had a disparate impact on black and Hispanic candidates and had not been validated as job-related. Complaint, *United States v. City of Chicago*, No. 73-C-661, ¶ 8(c), Appellants' Appendix at 3. On January 28, 1974 the parties entered into a Consent Decree that committed the City to "increase substantially the minority composition in the ranks of uniformed personnel within the Fire Department, so that it may become more representative of the racial and ethnic composition of the City as a whole." Amended Consent Decree at 3, Appellants' Appendix at 14. In pursuit of this goal, the City agreed to "adopt and seek to achieve a goal of hiring black and Spanish surnamed individuals for at least 50 percent of the uniformed personnel accepted annually for entry into the Fire Department for each of the next four years," *id.*

From 1974 to 1979 Chicago firefighters were hired pursuant to the terms of this Consent Decree. In 1978 the City administered Firefighters' Examination No. 8106. Those who passed the written examination, as well as a physical abilities test, were ranked on a list (the "8106 list") in order of their written examination scores. The test results showed an adverse impact on minority candidates[1] and the United States took the position that use of the 8106 list would not be consistent with Chicago's long-range hiring goals under the 1974 Consent Decree. After further negotiations the parties agreed to, and on June 26, 1979, the district court entered, an "Agreed-to Injunctive Order in Resolution of Firefighter Hiring Issues" ("Agreed-to Injunctive Order"), which settled this lawsuit so far as firefighter hiring issues were concerned. The Agreed-to Injunctive Order recommitted the City to the long-range goals of the 1974 Consent Decree; it also set forth the conditions under which the City could hire from the allegedly discriminatory 8106 list. The City would be allowed to hire from the list in rank order, without regard to race or national origin, until July 1, 1981 or until the five-hundredth name on the list was reached, whichever occurred first. It was contemplated that the City would take steps to develop and validate a new firefighter selection procedure by this time. If, however, the City determined that the needs of the City required further hiring from the 8106 list, the Agreed-to Injunctive Order provided that such further hiring would be on the basis of one black or Hispanic applicant hired for every white applicant hired. Agreed-to Injunctive Order, Appellants' Appendix at 23-33.

The City did not have a new test prepared by the time the five-hundredth name

[1]. Of 4132 whites who took the written examination, 1270 appeared on the 8106 list; 670 of 3286 black and Hispanic applicants made the list, as well as 39 of 136 listed as "other." Appellee United States' Brief at 4.

on the list was reached.[2] Since February 1982, it has been hiring firefighters on the one-minority-for-one-white basis required by the Agreed-to Injunctive Order. At present, however, there are 374 white candidates on the list while no eligible [3] minority candidates remain. In March 1985 the City announced a new firefighters' examination and sent notification to all candidates still on the 8106 list, informing them that it was retiring this list and that if they still wished to be Chicago firefighters they would have to take the new test. (The test was administered on July 15, 1985.)

When they learned this, the Applicants filed a motion with the district court seeking leave to intervene in this lawsuit.[4] They asserted that the City was retiring the 8106 list, thus passing them over for firefighter positions on account of their race in violation of 42 U.S.C. §§ 1981 and 1983. The accompanying complaint in intervention asked the court to certify them as representatives of a class (all white candidates on the 8106 list as of March 1985); to enjoin the City from striking the list until all class members had been hired as firefighters; to declare unconstitutional and vacate the Agreed-to Injunctive Order; and to enter a judgment in the class' favor for one million dollars and other appropriate equitable relief. Applicants' Complaint, Appellants' Short Appendix at 16–21. The City and the United States [5] opposed the application on the ground that it was not timely.

The district court ruled that insofar as the Applicants sought to intervene to challenge the terms of the Agreed-to Injunctive Order, the application was untimely. Insofar as they sought to challenge only the retirement of the list, the district court ruled they had no protectable interest in the City's continued use of the 8106 list and hence no basis for intervention. It denied the application to intervene and the Applicants appealed.

## II

■ To intervene as of right [6] in a pending lawsuit, the Applicants must meet four requirements. They must show (1) that their application is timely; (2) that they have an interest in the "property or transaction" which is the subject of the action; (3) that the disposition of the action will impair or impede their ability to protect that interest; and (4) that their interest is not adequately represented by existing parties. Failure to satisfy any one of these requirements is sufficient grounds to deny an application. The district court did not consider the third and fourth requirements because it believed that all claims the Applicants could make were foreclosed by the first two. The Applicants argue on appeal that the district court erred (1) in finding that they have no protectable interest in this litigation and (2) in ruling that the application to intervene was untimely. We

**2.** The City offered the district court the affidavit of Robert Joyce, Chicago's Deputy Commissioner of Personnel. Joyce explained that a firefighter strike in February 1980 required the City to hire eight hundred replacement firefighters so that the five-hundredth name was reached sooner than contemplated. Further, delay in creating a new test was caused both by the strike and the United States' suggestion that the City further analyze the impact of its selection procedures on women applicants. Joyce Affidavit, Appellants' Appendix at 91–94.

**3.** "Eligibility" in this sense appears to refer to whether an applicant can be found and pass a background test. See Appellee United States' Brief at 6.

**4.** Pending disposition of their application, the Applicants also filed a motion for a temporary

restraining order. This motion was heard and denied on April 4, 1985.

**5.** The United States has altered its position and supports intervention before this court. See infra.

**6.** Intervention as of right is governed by FRCP 24(a):

Upon timely application anyone shall be permitted to intervene in an action ... when the application claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the application's interest is adequately represented by existing parties.

will address each of these contentions in turn.

## A. The Applicants' Interest in this Lawsuit.

We note as an initial matter that the Applicants have not characterized the district court's assessment of their interest in this litigation with complete accuracy. The district court did not hold that the Applicants have *no* protectable interest at stake: it acknowledged that they have an interest in not being foreclosed from employment as firefighters on account of their race but held that this interest goes directly to the terms of the Agreed-to Injunctive Order and was thus untimely asserted. *United States v. City of Chicago*, No. 73–C–661 (N.D.Ill. June 19, 1985), at 5–6 [Available on WESTLAW, DCTU database]. It did hold, however, that the applicants could not claim a protectable interest on any theory that would challenge the retiring of the 8106 list without at the same time challenging the terms of the Agreed-to Injunctive Order, *id.* at 6–10, and the Applicants dispute this conclusion as well.

■ The Applicants claim that the district court erred in finding that they do not have a property interest in the continued use of the 8106 list grounded in the terms of the 1982 collective bargaining agreement between the City and the firefighters' union.[7] Appellants note especially section 16.10 of the agreement, which reads:

> The employer will maintain the present eligibility roster number 8106 for the term of this agreement. All new employees will be called and offered employment from this list in the order of their original numerical rank unless a different priority is ordered by the Federal Court.
>
> In such event, in recognition of the mutual interest of the Employer and Union in promoting harmonious relations within the department that will assure effective assimilation of new employees into the Department, the Employer and Union have entered into the supplementary agreement attached hereto as Appendix I.

Collective Bargaining Agreement, § 16.10, Appellants' Appendix at 85. Appellants as-

7. The contract was ratified by the Chicago City Council and enacted as a City ordinance on March 30, 1982. It was to expire on December 31, 1983, but its provisions would remain in effect during the negotiation of a successor agreement.

On March 19, 1986, after the briefs in this appeal had been filed, both § 16.10 and Appendix I of the 1982 contract were abrogated as "moot" by an arbitrator's award issued in the course of contract negotiations. *City of Chicago Fire Fighters Union Local No. 2, AFL–CIO*, No. 51–39–0058–84–R. The City had offered as a reason for their deletion that "a recent decision of the United States District Court by Judge McGarr has affirmed the City's right to remove the 8106 list as the means to acquire new hires." Appellants' Supplemental Brief, Appendix at 1. One month later, the City ratified and adopted as a City ordinance a new collective bargaining agreement. This 1986 contract contained (pursuant to the arbitrator's award) no mention of the 8106 list. It was given a retroactive effective date of January 1, 1984.

The City sought and was granted leave to file a supplemental brief in this case. It argued that these developments moot the issue of the Applicants' purported property interest in prospective employment as Chicago firefighters. There was no longer any question of a "mutually explicit understanding between the parties" on this

question, it contends, because "[t]he deletion of all reference to the 8106 list in the 1986 agreement, and its retroactive application to 1984, show that the parties intended the provisions which discuss the 8106 list to remain in effect no later than December 31, 1983...." Appellee City of Chicago's Supplemental Brief at 3. The City's argument is based on the fact that the 1982 agreement states that the City will retain the 8106 list "for the term of the agreement." The Applicants contend that this promise was breached when the City struck the list in March 1985. But the retroactive effect of the new contract shows, the City argues, that the parties meant "the term of this agreement" to mean "until December 31, 1983." Therefore, the Applicants had no property interest to assert in 1985.

We decline to embrace the City's reasoning because we have no evidence that the arbitrator made any such finding as to the parties' understanding as embodied in the 1982 contract. We only know that the City urged the arbitrator to rely on the district court's decision that the old contract created no interest and that the City could strike this list at any time. This, of course, is what we have been asked to determine on appeal. Under this set of facts we cannot say that this issue has lost its character as an actual controversy.

sert that this section gives them a property interest (in the form of a contract right) of which they may not be deprived without due process of law. We need not decide now whether an unconditional agreement for *prospective* employment gives rise to a protectable property right (all the cases cited by appellants concern the right to *continued* employment, *see, e.g., Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)) because whatever is promised in section 16.10 of this agreement is expressly conditioned upon the provisions of Appendix I of the agreement. Appendix I states that

> [T]he Employer and the Union agree to the following mutual undertakings with respect to maintaining the eligibility status and priority of persons on eligibility roster No. 8106 and the recruiting of minority applicants: (1) Eligibility Roster No. 8106 will be utilized to hire new employees until such time as such use conflicts with the terms of the order entered on June 21, [sic] 1979 by Judge McGarr [in this action.]

Collective Bargaining Agreement, Appendix I, Appellants' Appendix at 86. "To create a justifiable and reasonable expectation of job security, and thereby establish a property interest, there must be a mutually explicit understanding between the parties." *Hadley v. County of DuPage*, 715 F.2d 1238, 1242 (7th Cir.1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984). There was no mutual agreement in this contract to keep the 8106 list until it was completely exhausted because once the minority names on the list were exhausted, use of the list would presumably "conflict[ ] with the terms of the order entered on June 21, 1979...." Thus, the district court did not err in holding that the collective bargaining agreement creates no interest entitling the Applicants to intervene in this suit.[8]

The Applicants also assert that their protectable interest in this litigation is a constitutional right to be free from "arbitrary and capricious" compliance on the City's part with the terms of the Agreed-to Injunctive Order. They argue that the City acted arbitrarily when it violated the terms of the Agreed-to Injunctive Order by hiring replacements during the 1980 firefighters' strike without regard to the one-to-one requirement and by hiring a few persons who were not on the list at all. The district court did not address this contention in its decision, probably because this position is not pleaded as a grounds for intervention in the application. (One paragraph is devoted to this allegation in the proffered complaint in intervention. Applicants' Complaint ¶ 14, Appellant's Short Appendix at 18.) In any event, it is difficult to see what interest the Applicants are seeking to advance with this allegation. It is undisputed that hiring during the strike was without regard to either race or rank on the list, which appears to make this hiring irrelevant to the claimed racial discrimination. More important, the Applicants concede that they were offered employment during the strike and refused because they did not choose to break the strike. Therefore, the only possible prejudice to the Applicants from the hiring during the strike was the likelihood that there would be fewer vacancies to be filled (and which would be filled on a one-to-one basis) after the strike. But the Applicants certainly knew this when they turned down the offer of employment.

In sum, we conclude that the district court was correct in ruling that the only interest that the Applicants have in this lawsuit results from their assertion that they are being denied employment as firefighters on account of their race. The question, then, is whether the district court

---

**8.** In their Reply Brief, the Applicants also point to section two of Appendix I, which addresses possible priority status on a new firefighter list for those remaining on the 8106 list in the event that the 8106 list can no longer be used under the Agreed-to Injunctive Order. This section cannot demonstrate a mutual agreement to continue to use the 8106 list; by its terms, it discusses what should happen after this list is retired. The issue of priority status is not before us on this appeal.

abused its discretion in finding that this claim was not timely raised.

## B. Timeliness.

■ As to the contention that retiring the 8106 list discriminates against the Applicants on account of their race, the district court ruled that the application for intervention was untimely. The question whether an application is timely is committed to the discretion of the district court; "unless that discretion is abused, the court's ruling will not be disturbed on review." *NAACP v. New York*, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973) (footnote omitted); *see also FDIC v. Hanrahan*, 612 F.2d 1051, 1053 (7th Cir.1980). We note in this regard that Judge McGarr has been presiding over this case since 1978, was the judge who entered the Agreed-to Injunctive Order and is very well acquainted with the issues involved. In assessing the timeliness of this application to intervene, the court considered the proper factors: (1) the length of time the Applicants knew or should have known of their interest in the litigation; (2) the extent of prejudice to the existing parties if intervention were granted; (3) the extent of prejudice to the Applicants if intervention were denied; and (4) the existence of any unusual factors that militate for or against intervention. *See South v. Rowe*, 759 F.2d 610, 612 (7th Cir.1985); *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir.1977).

The parties to this appeal contend most strenuously over the first of these factors—the length of time the Applicants knew or should have known of their interest in this suit. The City contends that the Applicants knew or should have known that their interest in being hired from the 8106 list in rank order was in jeopardy before or at the time the Agreed-to Injunctive Order was entered in 1979 and that they also knew or should have known at that time that the list would be discarded

when it could no longer be used under the court order. The Applicants and the United States both assert that the application for intervention was timely but reach that conclusion in different ways.

■ The Applicants concede that they want to intervene to overturn the Agreed-to Injunctive Order. But the district court, they say, looked only to the date the Agreed-to Injunctive Order was entered in assessing timeliness and improperly ignored other circumstances affecting their awareness of a need to intervene to protect their interests. They argue that they knew in 1979 that they would not be hired in rank order but did not know, and had no reason to know until the City announced the new examination, that they would not be hired *at all*. In this regard, they point to the 1982 collective bargaining agreement, which they argue led them to believe that the City had undertaken to employ them eventually. "To be asked to give up your seat on the bus for another man is one thing, to be told to get off the bus entirely is quite another." Appellant's Brief at 13. However, as we noted *supra*, the collective bargaining agreement did not confer an unconditional right to employment. It expressly incorporated the terms of the Agreed-to Injunctive Order. Under the Agreed-to Injunctive Order, the City was free to discard the 8106 list as soon as it produced a new, validated examination and was bound to discard it when one-for-one hiring was no longer possible. Thus, the Applicants' analogy is not apt: they stood on the bus so that others might sit, but they did so with notice that everyone standing could be asked to debark at any time. The Applicants had notice when the Agreed-to Injunctive Order was entered that they might not be hired on account of their race.[9]

The United States' approach is somewhat different. It narrows the Applicants' protectable interest to a challenge to the discriminatory action of the City in striking

9. Failing that, they might have intervened when the quota hiring started in February 1982. At that point, over three years before they actually sought intervention, the racial preferences they complain of actually started to be applied.

the 8106 list because all remaining candidates were white. It concedes that it is too late to challenge the terms of the 1979 Order and further concedes that the Applicants were on notice that the list could be struck (in favor of a new exam) at any time. It asserts, however, that intervention is timely on the single ground that the list is being retired for a racially discriminatory reason. The Applicants could not have known until the City announced that the list was being discarded that only white candidates would remain on the list at the time it was discarded.

The problem with this argument is that this very specific interest that the United States has isolated cannot support the weight the United States seeks to place upon it. The United States concedes that the Applicants could not prevail on this theory[10] because the City's actions were motivated not by racial animus but rather by the mandate of the district court. The City's action in retiring the list cannot be separated from the entire remedial scheme agreed to in 1979. The Agreed-to Injunctive Order expressly limited the City's use of an eligibility list that the United States at least then believed to be racially discriminatory. The parties settled their dispute and part of the compromise was that the only way in which the City could use the list after the five-hundredth name (or July 1, 1981) was according to the racial quota set forth in the Order. Thus, the Agreed-to Injunctive Order must be read as requiring the City to stop hiring from the 8106 list when no minority candidates remained on the list to balance white hires. Any challenge to retiring the list because of its racial composition is of necessity a challenge to the terms of the Agreed-to Injunctive Order.

We entertained a similar argument (also on the part of the United States) in our recent case involving police department hiring, *United States v. City of Chicago*, 796 F.2d 205 (7th Cir.1986). In that case, the City had announced that it was retiring a police department eligibility list from which it was hiring under the terms of a court-ordered quota system. A group of candidates sought to intervene on the ground that the list was being retired because of the race of the candidates still on the list. We affirmed the district court's decision denying intervention because the application was untimely, choosing not to embrace the United States' argument:

> The United States argues that the Baker petitioners' motion to intervene is timely because "they had no reason to expect that the list would be exhausted of black males before it was exhausted of white males and females." Since white males, females and minority males appeared on the eligibility list in roughly the same percentages, the United States argues, the Baker petitioners had reason to assume that no group would be exhausted before any other. But the fact that the Baker petitioners had some basis for assuming that they would ultimately be hired does not justify their waiting until this assumption was proved false to intervene. They knew their interests were compromised when the quotas for the 1981 exam were introduced and the rank ordering of scores—which favored non-minorities and had a disparate impact against minorities—was disregarded.

*Id.*, 796 F.2d at 209 n. 7. There, under substantially the same facts, we held that the interest in the list's retirement could not be separated from the interest in the quota system which first compromised the

---

**10.** This is the crux of the very novel intervention argument outlined by the United States. It argues that this one narrow grounds for intervention "lacks any merit" but nonetheless urges that the Applicants have articulated an interest sufficient to warrant intervention under FRCP 24(a). We call this argument "novel" because we do not see the merit in allowing intervention to assert a claim that (to use the United States' own description) "borders on the frivolous," Appellee United States' Brief at 18. We agree with the proposition that it would be error to deny intervention because of a belief that the intervenors, if put to their proof, could not prevail. But applicants for intervention as of right must be able to articulate a "significantly protectable interest" in the ongoing litigation, Fed.R.Civ.P. 24(a)(2); if they cannot state a legally cognizable claim, they cannot be said to have done so.

applicants' claims. *Id.* at 209–210. Here, too, it was no abuse of discretion for the district court to have decided that the Applicants knew or should have known of their interest in this lawsuit substantially before March of 1985.

■ We also agree with the district court's assessment of the balance of the hardships. The City currently has a five-year old firefighter hiring list [11] from which it cannot hire without breaching the settlement it entered with the United States in 1979. It has developed a new, nondiscriminatory firefighter examination and has already administered it to some twenty-thousand new applicants. The City has a very great interest in discarding the 8106 list without becoming involved in protracted litigation.[12] We sympathize with the Applicants, who are experiencing a great personal disappointment and feel as if they have been treated very unfairly by the City and the United States. They are not, however, barred from retaking the test and being placed on a new eligibility list. Their situation is unfortunate but we do not think that the district court abused its discretion in ruling that the City would suffer greater prejudice if intervention were granted than the Applicants would suffer were it denied.

■ Finally, the Applicants cite several "unusual circumstances" which they contend militate in favor of allowing them to intervene. They point to the City's delay in formulating and validating a new examination and to the firefighter strike, which required the City to start quota hiring earlier than contemplated. As we explained above, neither of these unexpected occurrences excuses the Applicants' failure to intervene earlier. Applicants also consider the very nature of the Agreed-to Injunctive

Order an unusual circumstance, in that "for over 12 years the City and the Justice Department have by agreement imposed racial quotas on the City without any finding that the City's hiring practices were discriminatory." Appellants' Brief at 18–19. The strength of this argument has been weakened by the Supreme Court's recent decision in *Local 93, International Ass'n of Firefighters v. City of Cleveland,* —— U.S. ——, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). In any event, it does not serve to excuse the Applicants' tardiness; if anything it points up why the Applicants ought to have sought intervention much sooner.

After examining the factors applied by the District Court we cannot say that it abused its discretion in ruling that the application to intervene was untimely. Therefore, the judgment of the district court is AFFIRMED.

---

**11.** By way of comparison, City of Chicago personnel rules call for keeping such lists for one year. City of Chicago Personnel Rule VII, § 3(d).

**12.** The United States downplays this concern, arguing that it and the City would not be greatly prejudiced "because the intervenors' allegation is so lacking in merit that the district court would be able to enter judgment against them expeditiously." Appellee United States' Brief at 22. We are not so sanguine as the United States about the ease of the issues involved. A consti-

tutional challenge to the terms of the 1979 Agreed-to Injunctive Order would be a complicated matter, especially in light of the unsettled state of the law in this area. Further, we once again believe that the United States is being highly inconsistent: if the district judge will be able to summarily dismiss the Applicants' claim as meritless (as the United States assures us, *see supra* note 10), how can we say that the Applicants are greatly prejudiced by the district court's order denying intervention?