**William DIZE, et al., Plaintiffs,**

v.

**AMALGAMATED COUNCIL OF GREYHOUND LOCAL UNIONS, et al.**

**Civ. A. No. 87–3482.**

United States District Court, District of Columbia.

April 15, 1988.

As Corrected April 20, 1988.

Edward D. Friedman, Elliott Andelman, Friedman & Wirtz, Washington, D.C., for plaintiffs.

Carl L. Taylor, Washington, D.C., Lawrence J. McNamara, Dallas, Tex., for defendants.

Elliott C. Lichtman, Washington, D.C., for Intervenor Evans.

Allan Dranitzke, Washington, D.C., for Intervenor Local 1202.

Joseph W. Moreland, Kansas City, Kan., Earl Putnam, Washington, D.C., amicus curiae for ATU, AFL–CIO.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

The plaintiffs on behalf of themselves and approximately 1400 former bus drivers who were employed by Trailways Lines, Inc. (Trailways), filed this action on December 23, 1987. They seek to enjoin the Amalgamated Council of Greyhound Local Unions (Council), in conjunction with the other defendants, Greyhound Lines, Inc. (Greyhound), GLI Acquisition Company (GLIAC), and GLI Holding Company (GLI), from continuing to violate its duty of fair representation owed to the plaintiffs after the merger of Trailways and Greyhound.

The case is now before the Court for approval of the Decision of the Special Master (Decision) filed on January 25, 1988, the motion for leave to intervene filed by Local 1202, the motion for leave to intervene filed by R.P. Evans and other original Greyhound drivers, the motion filed by R.P. Evans and other Greyhound drivers to modify the January 4, 1988 referral to the Special Master and to restore the status quo, the motion of Amalgamated Transit Union to file and participate as Amicus Curiae and several other motions including GLI's motion to strike and for sanctions.

After giving careful consideration to the Decision and the various motions filed in this case, the Court concludes that the motions to intervene filed by Local 1202, and R.P. Evans and other original Greyhound drivers should be denied, but the Court accepts their participation as Amicus Curiae; the motion of Amalgamated Transit Union to appear as Amicus Curiae is granted; the motion to modify the referral to the Special Master filed by R.P. Evans and other original Greyhound drivers is denied. The briefs filed by the movants will be treated as having been filed as Amicus Curiae. All other motions are denied. The Decision of the Special Master is accepted as filed and is entered as the final order of the Court.

### I

The underlying facts are as follows: On March 19, 1987, GLI purchased the Greyhound bus system[1] and on July 14, 1987, purchased Trailways, thereby combining

1. The original Greyhound bus system was owned by the original Greyhound Company, a separate and distinct entity from the parties involved in this case.

approximately 3000 regularly scheduled Greyhound routes and 700 regularly scheduled Trailways routes, comprising over 90% of the Nation's intercity bus capacity. Since March 19, 1987, GLI has directed the work and controlled the labor relations of approximately 6000 former Greyhound drivers, to which it added approximately 1400 additional Trailways drivers on July 14, 1987. The former Greyhound drivers, from the original Greyhound Company, were members of the Council Union prior to July 14, 1987, while the plaintiff class were members of three other unions prior to the above date; the United Transportation Union, the Amalgamated Council of Trailways Local Unions and an independent union.

On or about March 19, 1987, GLI as successor to the original Greyhound Company, recognized the Council as the exclusive bargaining representative of its then newly hired GLI bus drivers. At that time, GLI and the Council agreed that the seniority of the former Greyhound drivers, GLI's new hires, should date back to the first day of their employment with the original Greyhound Company.

Plaintiffs state that the recognition of seniority based on the former Greyhound drivers date of hire by the original Greyhound Company was critical to the membership of the Council since the opportunity to bid on run assignments and otherwise obtain and retain work, among other things, is governed by seniority. Seniority determines where, when, and how a driver works. Seniority determines where the driver lives, when the driver may see his or her family, and the amount, extent and regularity of the driver's earnings. New hires lack sufficient seniority to obtain work on regular runs, are subject to seasonal layoffs, and usually work as substitute drivers with assignment from what is called the "extraboard." Plaintiffs contend, apparently without contradiction, that new hires are limited to minimal earnings.

Upon purchase of Trailways, GLI recognized the Council as the exclusive bargaining representative of the plaintiff class; thus plaintiffs contend that the Council as-sumed the statutory duty to represent the plaintiff class fairly and evenly with all other drivers in the GLI collective bargaining unit.

The plaintiff class began work for GLI on and after July 14, 1987 with the Trailways date of hire seniority intact and fully recognized. After that date, GLI commenced negotiations with the Council on the subject of the retention of seniority then accorded to the plaintiff class. GLI proposed in the negotiation that the plaintiff class, with certain minor modifications, have their Trailways date of hire seniority made permanent. The GLI proposal would have accorded the former Trailways drivers the same seniority treatment that the former Greyhound drivers had been accorded four months earlier, thus merging the Trailways and Greyhound seniority lists in a system called "dovetailing."

The plaintiffs contend that the Council "arbitrarily refused" to agree to the proposal which would have dovetailed the seniority lists. Plaintiffs state that the Council countered with a demand for contract concessions in wages and benefits estimated by GLI to cost more than 30 million dollars as the price for some limited form of seniority recognition for the plaintiff class. Finally, the dovetailing proposals were abandoned and GLI proposed another form of seniority protection for the plaintiff class. It is alleged that the Council rejected that plan as well and that the Council insisted upon "endtailing." Endtailing refers to a system under which seniority of the Trailways drivers would be determined from July 14, 1987, the date Trailways was acquired by GLI. Plaintiffs note that the GLI proposal was rejected on November 10, 1987, "when an overwhelming majority of members with pre-hire Greyhound seniority, at the urging of some elected officers, voted it down." Complaint par. 18.

In their complaint, the plaintiffs ask that the Court issue a permanent injunction enjoining the defendants from implementing the new seniority rosters and work assignments endtailing the plaintiff class, award the plaintiff class their lost wages and fu-

ture wages, reinstate seniority and wages to plaintiffs and award the members of the class the sum of $25,000 each.[2]

## II

In Part I, *supra*, the Court set forth the factual allegations made by the plaintiffs which are essentially undisputed. Here, the Court sets forth the background of this litigation and the agreements entered into by the parties.

When the plaintiffs filed their complaint, they also filed a motion for a temporary restraining order. The Court, with the agreement of the parties, did not entertain the motion for a temporary restraining order, but instead scheduled a hearing on plaintiffs' motion for a preliminary injunction for January 4, 1988. *See* Order filed December 28, 1987.

Prior to the January 4th hearing, the Court was informally advised by the parties that the parties had tentatively agreed to a procedure for handling the case which would have the Court approve and enter a Consent Order appointing a Special Master to consider this case. At the January 4th hearing, counsel for the parties advised the Court that the parties had entered into an agreement under which the case was to be referred to a Special Master, Lawrence E. Seibel,[3] to determine certain issues. The parties agreed to share the expenses of the Special Master. The plaintiffs also presented an unopposed motion for class certification.

At the hearing, the parties presented the Court with the Stipulation of the Parties (Stipulation) which was signed on behalf of all parties. In the Stipulation, the parties agreed that the Court should appoint Mr. Seibel as Special Master to determine two issues raised in the case. *First,* under "all the circumstances of this case, did the Union [Council] violate its duty of fair representation under federal labor law." *Second,* if the Special Master found that the Counsel did violate its duty of fair representation, "how should seniority fairly be allocated between the Greyhound and Trailways drivers on one integrated seniority list." The Stipulation set forth a procedure to be used before the Special Master. All parties to the case were to participate in the proceedings and the record was to consist of the record in the instant case and the record in *GLI Holding Company v. Amalgamated Council of Greyhound Local Unions,* Civil No. 87–2144 (D.D.C.), hereinafter sometimes referred to as the *GLI Holding Company* case.[4] The Stipulation provided for the presentation of evidence before the Special Master and set forth the dates and place for hearing and the dates for specified action. It provided that the Special Master was to file his final decision on or before January 25, 1988. It also provided that the decision of the Special Master was to become "effective immediately." In addition, it provided that: "In no event shall the Special Master's award impose damages, costs, or fees on any of the parties." On January 25, 1988, the Special Master was to file his Decision for review by the Court. The Stipulation was approved, signed and filed by the Court on January 4, 1988.

Pursuant to the agreement of the parties and the Stipulation, the Court signed and filed a Consent Order on January 4, 1988. The Consent Order provides, in part, that "the award of the Special Master shall constitute a final settlement and resolution of this controversy binding upon all parties to this litigation pending final approval of the Court." Consent Order, par. 6. The Con-

---

**2.** The class was certified as the result of an order filed on February 1, 1988.

**3.** The parties proposed that the Court appoint Mr. Seibel as Special Master.

**4.** The *GLI Holding Company* case was filed in the United States District Court for the District of Columbia and was assigned to the Honorable Joyce Hens Green. The case was an action by GLI seeking to have the court declare unlawful and to prevent enforcement of certain seniority rights provisions of the collective bargaining agreement between GLI, the Council and the Amalgamated Transit Union. A prime purpose of the suit was to prevent the enforcement of the entailing provision of the collective bargaining agreement. Judge Green, in a Memorandum Opinion and Order filed on October 7, 1987 determined that the court lacked jurisdiction and accordingly, dismissed the case.

sent Order provides also that the Court shall review the award of the Special Master "to ensure that it is consistent with [the Consent Order]."

After the Special Master filed his Decision, the Court entered an Order based upon the Agreed Motion for Class Certification filed by the parties on January 29, 1988. In that order, the Court made the requisite findings and ruled that the class consisted of the following persons:

> All bus drivers employed by Trailways on July 13, 1987, who have subsequently accepted employment as drivers by Greyhound on or after July 14, 1987, or who were on sick leave on July 13, 1987.

*See* Order filed February 1, 1988. The Order for class certification also provided that a Notice to Former Trailways Drivers would be sent to all class members describing the action, setting forth the status and advising the class members of their right to file objections, provided that such objections were received by the Court on or before March 7, 1988. The Notice also provided that the Court would hold a hearing to consider entry of judgment and any objections thereto "at 1:30 p.m. on March 21, 1988 in Courtroom 17, 6th floor." [5]

At the hearing the Court heard arguments on the motions to intervene. The Court also advised counsel for the Amicus Curiae that its brief would be accepted for that limited purpose. The Court then heard only objections by those members of the class who had complied with the requirements of the Notice and who chose to speak in open court.[6]

## III

■ The first issue which must be addressed by the Court is whether the motions to intervene filed on behalf of R.P. Evans and other original Greyhound drivers and on behalf of Local 1202 should be granted. After careful consideration of the motions and oppositions thereto, the Court concludes that the motions to intervene should be denied.

Fed.R.Civ.P. 24(a) provides:

> **(a) Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

First, consideration must be given as to whether the movants have demonstrated that they assert an adequate interest in the subject of this litigation to be permitted to intervene. R.P. Evans "and other original Greyhound drivers" are not members of

---

**5.** The hearing on March 21, 1988 was actually held in Courtroom 20, also known as the Ceremonial Courtroom, for the reason that the Ceremonial Courtroom could accommodate all of the former Greyhound and Trailways drivers who attended the hearing. A notice was posted at the door of Courtroom 17 reflecting the change in the place of the hearing. Moreover, both Courtrooms are on the 6th floor and any member of the public seeking to enter Courtroom 17 must necessarily pass the Ceremonial Courtroom. Deputy United States Marshals and Courthouse security personnel were also posted in the hallway outside of both courtrooms to direct interested persons to Courtroom 20.

**6.** The Notice provided that "[a]ny person [member of the class] objecting to entry of judgment may appear at the hearing in opposition to entry PROVIDED that on or before March 7, 1988 a written objection and written notice of intention

to appear, along with copies of all papers to be submitted, have been filed with the Clerk of the Court and also provided to Edward D. Friedman [counsel for the plaintiffs] at the addresses" listed in the Order. Notice at 4–5. A total of 22 purported members of the class were eligible to speak as determined from the Court's list and the list maintained by counsel for the plaintiffs. Of that number, 14 members of the class appeared and spoke. One gentlemen who sought to speak was not permitted to do so because he is not a member of the class. He is a former Greyhound driver. One other person who asked to be heard but who had not complied with all of the requirements of the Notice was also permitted to address the Court with only a technical objection being asserted by counsel for GLI. No other person asked to address the Court or attempted to address the Court at the hearing.

the class of former Trailways drivers, but as is amply demonstrated by the record, including the many letters received by the Court from former Greyhound and Trailways drivers, every driver has an interest in this litigation since a final determination will affect most of the drivers. As the plaintiffs have alleged in their complaint, the issue of seniority impacts on whether a driver obtains or retains work, on where, when, whether and how he or she works, and whether and when the driver sees his or her family, and on the amount, extent and the regularity of the drivers' earnings. While Local 1202 will not suffer the direct injury that Evans and the other Greyhound drivers may suffer, Local 1202 asserts rights on behalf of the same drivers. *See Dimond v. District of Columbia*, 253 U.S. App.D.C. 111, 124, 792 F.2d 179, 192 (1986). Thus, for the purpose of intervention, the Court treats the motions by the movants as demonstrating a sufficient interest.

The next question to be addressed is whether the movants' interest are adequately represented by the Council or the other defendants before the Court. "The original burden of showing inadequate representation rests on the applicant for intervention." *Id. See also, National Resources Defense Council v. Costle*, 183 U.S.App.D.C. 11, 18, 561 F.2d 904, 911 (1977). Here, the Court finds the argument that the representation by the Council was inadequate without merit. This action was brought against the Council by the plaintiffs because the plaintiffs contend that the Council was looking after the interest of the former Greyhound drivers to the detriment of the plaintiffs. Indeed, plaintiffs allege a failure of the Council to afford plaintiffs adequate representation and they charged the Council with adamantly insisting upon endtailing the plaintiff class.

Of course, while that was the allegation at the time the complaint was filed, the position of the Council could change, and that is what the movants appear to allege. But, a review of the record does not support the movants' contention in this regard. Once the parties had entered into the Stipulation and the Consent Order, the Council

did not rest in its efforts to assert the contentions of the former Greyhound drivers. Rather, the Council filed a 68 page brief with the Special Master seeking to show that the Council afforded the plaintiffs fair representation and attempting to convince the Special Master that members of the plaintiff class should not be permitted to displace the former Greyhound drivers. Brief of Amalgamated Council of Greyhound Local Unions in Opposition to the Motions of Local Union 1202 and R.P. Evans, et al for Intervention as Parties Defendant (Council Opposition), Appendix G. The Council's argument before the Special Master can be summed up in its statement that, "[u]ltimately, any allocation of seniority which would cause a single driver in the pre-acquisition Greyhound group to lose employment, or to have his/her employment opportunities substantially diminished, would be inherently unfair in the circumstances." *Id.*, Appendix G at 65.

It also seems beyond question that the Council will seek to continue its representation of the movants and the drivers they represent as well as other drivers. Thus, this case is distinguishable from *Dimond* where the interest the District of Columbia sought to represent differed substantially from the interest of State Farm. There, nothing suggested that the District of Columbia would be inclined to make the same legal arguments as the insurance company. Here, the opposite is true. Moreover, the movants have not demonstrated that they would have asserted a different argument in representing the former Greyhound drivers. In fact, the only difference appears to be one of approach or tactics. Perhaps the movants would not have entered into the Stipulation and Consent Order, but even that is not without question since the movants now have the benefit of hindsight and may act as a Monday Morning Quarterback. It may be that if given a second chance, the Council would have taken a different approach. But this is merely a question of tactics.

In reviewing the actions taken by the Council, it is understandable why it agreed to the Stipulation and Consent Order. In

weighing all factors, the Council concluded that it was in the best interest of the unions *and* the former Greyhound drivers to submit the issues to a Special Master who specializes in labor law. The Council expressed concern that a federal court, not being as well versed in labor law as the Special Master, might conclude that the fair approach to the issue would be to dovetail all drivers, Greyhound and Trailways. Such a decision would have displaced or disrupted more Greyhound drivers than will result from the Decision of the Special Master. The Court was not and is not required to reach that question and its comments are not intended to suggest that it would have reached a different result than the Special Master or that the result reached would have been more onerous insofar as the former Greyhound drivers are concerned.

The R.P. Evans movants argue that another difference is that the movants, on behalf of the drivers, seek to enforce Article B–2 of the collective bargaining agreement, and that the Council does not. But that argument is misleading because what both the Council and the movants sought to do is to protect the seniority interest of the former Greyhound drivers. The fact that the movants may seek to do so by way of Article B–2 represents nothing more than a tactical decision. Moreover, the movants have not demonstrated that their arguments, other than possibly their approach, would have differed from that of the Council.

The Court concludes that the Council adequately represented the former Greyhound drivers.

### IV

■ "Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and 24(b), that the application must be 'timely'. If it is untimely, intervention must be denied." *National Association for the Advancement of Colored People v. New York*, 413 U.S. 345, 365, 93 S.Ct. 2591, 2602–2603, 37 L.Ed.2d 648 (1973). "Although the point to which the case has

progressed is one factor in the determination of timeliness, it is not solely dispositive. Timeliness is to be determined from all the circumstances." *Id.*, U.S. at 366, S.Ct. at 2603.

The Court concludes that the motions to intervene in the instant action are untimely. While the period between December 23, 1987, the date that the action was filed, and March 7, 1988, the date the motions to intervene were filed, is relatively short; as stated by the Supreme Court, timeliness must be determined on *all* of the circumstances.

First, it is clear that the movants were aware that this action was pending and that the parties had entered into an agreement under which the issues were to be submitted to a Special Master. The movants do not argue otherwise.

Second, the issues to be submitted to the Special Master are clearly set forth in the Stipulation and the Consent Order. On the first page of the Stipulation it provides that the matters to be submitted to the Special Master are; (1) whether the Council violated its duty of fair representation under federal labor law and, (2) if the Council did violate its duty, how should seniority fairly be allocated between the Greyhound and Trailways drivers on one integrated list. No clearer statement of the issues could have been given by the parties. If the only issue had been whether the Council violated the labor laws, it may have been possible to argue that the movants did not understand that the Special Master would go forward and decide the issue of seniority. But, seniority is the crux of the issue, and it was clearly stated that the Special Master would determine that issue in the event he determined that the Council had violated its duty of representation.

Third, not only was it clear that the Special Master would make the above determinations, it was also clear that the decision of the Special Master would be binding on the parties absent a determination by the Court that the Special Master overstepped the bounds of the Stipulation and Consent Order. The Stipulation provides that "the award of the Special Master

shall constitute *a final settlement and resolution of this controversy binding on all parties to this litigation pending final approval of the Court."* Stipulation, par. 6. The Stipulation goes on to provide that: "Upon approval by the Court, and after such proceedings as the Court deems necessary with respect to class certification and notice, *the award of the Special Master shall be entered as the final order of the Court in the action." Id.*

The above language, which is also contained in the Consent Order, made it abundantly clear that the case was going to be resolved in the hearing before the Special Master. The Stipulation and Consent Order also provided that the proceedings would be expedited, and provided a definite schedule. It was provided that the parties would exchange documents and witness lists on January 8, 1988, that the hearing before the Special Master would commence on January 12, 1988, that the Special Master would informally serve the parties with his decision and award on January 21, 1988, and that the Special Master would file his *final* decision on January 25, 1988. Moreover, it is provided that the decision of the Special Master would be *effective immediately.*

Thus, it is clear that as early as January 4, 1988, the date of the Stipulation and the Consent Order, the movants were on notice that the issues were being submitted to a Special Master. In addition, the Stipulation and Consent Order also identified the Special Master. The Notice to the members of the class also advised class members that objections had to be filed on or before March 7, 1988.

Insofar as the impact of the agreement on the rights of the movants, the possible impact was known to the parties and the movants on January 4, 1988. Thus, the movants are hard put to argue at this late date that they did not understand the possible ramifications. The movants argue that they would not have submitted the case to a Special Master and that the Council lacked the power to do so. But, the fact that the Council intended to do so was known on January 4, 1988. Moreover, the position and arguments of the Council before the Special Master were known by mid-January 1988. Under these circumstances, the filing of the motions to intervene on March 7, 1988, almost two months after the hearing before the Special Master, and over a month after the Special Master filed both his informal decision and his final decision, is untimely. This is especially true when consideration is given to the nature of the case pending before the Court, and the need for expedited resolution.

The facts in this case differ from those in *Dimond v. District of Columbia, supra.* In *Dimond,* State Farm sought to intervene only two days after the District Court clarified the effect of its ruling that the $5,000 medical expenses threshold violated the Constitution. 253 U.S.App.D.C. at 125, 792 F.2d at 193. As the Court of Appeals noted, "[u]ntil that time, State Farm might reasonably have believed that the District of Columbia's interest in defending the validity of the entire 1982 No–Fault Insurance Act would also insure that State Farm's interests were adequately protected." But, as is demonstrated above, that is not the case in the instant matter. The movants possessed all of the information necessary to make a determination as to intervention as early as January 4, 1988. The only fact unknown to the movants was the Decision of the Special Master.

What has been stated with respect to the movants' motions to intervene as of right, applies with equal force to the motions to be granted permissive intervention in the case. *See* Fed.R.Civ.P. 24(b). The Court in its discretion denies the motions for the reasons stated above.

Finally, with respect to the question of intervention, to allow the movants to intervene at this late date; even if the Court should consider that date as March 7, 1988, would be unfair to the parties and would completely set aside the time schedule agreed to by the parties. Such intervention would also be prejudicial.

Weighing all of the above factors, the Court concludes that the motions to intervene should be denied for the reasons set

forth above. Moreover, the motion of R.P. Evans and the original Greyhound drivers to modify the January 4, 1988 referral to the Special Master must also be denied.

## V

■ Although not directly involved in the decision as to whether the movants are entitled to intervene, the Court notes that the movants allege that the Council did not act properly or with full authority in entering into the Stipulation and approving the Consent Order. The record reflects, however, that the Council was the exclusive bargaining agent of the drivers. Moreover, the President was unable to convene a meeting of the full Council to make the determination required in the case in the time frame. Under these circumstances, the President of the Council had the authority to act. In doing so, he consulted with the Financial Secretary. More important, the President thereafter made a report to the full Council; the Council considered the action taken and expressed its support of the actions taken by the President. The Minutes reflect that the Council unanimously approved the action of the President as follows:

> After much discussion of the matter, Brother Cushing–Murray made a motion that the Council support the President of the Council (Brother Owsley) and that he acted with the best interest of the membership in mind as it relates to the Trailways seniority issue that was submitted to arbitration. Motion was seconded and passed *unanimously*.

Owsley Affidavit, par. 19 (emphasis the Court's).

The Court is satisfied that the President of the Council acted properly and within his authority, and that his actions were thereafter ratified by the Council.

## VI

The only matter remaining for the Court to determine is whether the Special Master in making his decision acted in a manner consistent with the Stipulation and the Consent Order. After reviewing the Decision, the Court is satisfied that he did follow the mandate of those documents.

Finally, the Court considers the objections made by the members of the class. In doing so, the Court considers the written objections and the objections made at the hearing held on March 21, 1988. After considering those objections, the Court is satisfied and concludes that the Decision of the Special Master should be approved and that the award of the Special Master should be entered as the final order of the Court in this case.

The Court recognizes that not every member of the class, or for that matter, every driver, whether former Greyhound drivers or Trailways drivers, is satisfied with the final decision in this case. Unfortunately, the issues presented are difficult and are not capable of a solution which would result in every driver maintaining his or her status as of July 13, 1987. But, the Court is satisfied that the parties have made their best effort and that the Decision of the Special Master is reasonable and fair to both the former Greyhound drivers and the former Trailways drivers. No interested person has suggested a solution that would not adversely impact on a substantial number of the drivers.

The Decision of the Special Master will be entered as the final order of the Court.

An appropriate order has been entered.

## ORDER

Pursuant to the accompanying Memorandum, it is hereby

ORDERED that the motion to intervene of R.P. Evans and other original Greyhound drivers is denied, and it is further

ORDERED that the motion to intervene by Local 1201 is denied, and it is further

ORDERED that the motion by R.P. Evans and other Greyhound drivers to modify the January 4, 1988 referral to the Special Master is denied, and it is further

ORDERED that the motion of Amalgamated Transit Union to file and participate as Amicus Curiae is granted, and it is further

ORDERED that the briefs submitted by Local 1201 and R.P. Evans and other original Greyhound drivers are treated as having been filed by an Amicus Curiae, and it is further

ORDERED that the other motions filed by the parties are denied, and it is further

ORDERED that the decision of the Special Master, which was filed with the Court on January 25, 1988, is adopted and incorporated herein as the final order of the Court.