NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 68

No. 2018-251

| | |
|---|---|
| State of Vermont, et al. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Ariel Quiros, et al. | April Term, 2019 |

Mary Miles Teachout, J.

Thomas J. Donovan, Jr., Attorney General, and Kate T. Gallagher, Assistant Attorney General, Montpelier, for Plaintiffs-Appellees.

Russell D. Barr, Chandler W. Matson and Benjamin E. Novogroski of Barr Law Group, Stowe, for Intervenor-Appellants Antony Sutton, et al.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1.    **CARROLL, J.**    Intervenors, a group of foreign investors who were allegedly defrauded by defendants, appeal an order denying their motion to intervene in the State's enforcement action brought against defendants. We affirm because the motion to intervene was untimely.

## I.    Factual and Procedural Background

¶ 2.    This case arises from a series of plans overseen by defendants to develop several real estate projects in the Northeast Kingdom of Vermont. Work on these projects spanned eight years, including fundraising and planning stages, and involved several limited partnerships and other corporate entities (the Jay Peak Projects). The Jay Peak Projects, at the direction of

defendants Ariel Quiros and William Stenger, raised investment funds largely through a federal program known as the EB-5 Immigrant Investor Program (EB-5 Program). See generally 8 U.S.C. § 1153(b)(5). Under the EB-5 Program, foreign investors receive a path to expedited United States residency in exchange for a $500,000 investment in a qualifying project. After making the initial investment, investors receive conditional residency in the United States, which, under the program, converts into permanent residency if, among other conditions, the investment can be traced to the creation or preservation of ten jobs over a two-year period. Here, investments were made in limited partnership interests, as offered by the Jay Peak Projects to foreign investors in seven different projects, referred to as Phases I through VII.

¶ 3. On April 12, 2016, the Securities and Exchange Commission (SEC) brought an enforcement action in federal court against the Jay Peak Projects and the two principal directors—Quiros and Stenger—alleging federal securities law violations. The SEC alleged that instead of properly allocating the EB-5 investment funds raised by defendants to support the development of the projects as advertised, defendants Quiros and Stenger misappropriated and improperly commingled the investment funds in a series of accounts. The next day the federal court granted the SEC's ex parte request for the appointment of a receiver to "administer and manage the business affairs, funds, assets, causes in action and any other property of the [Jay Peak Projects entities]; marshal and safeguard all of their assets; and take whatever actions are necessary for the protection of the investors." In addition, the federal court issued a bar order enjoining all persons with notice of the order from prosecuting any actions or proceedings that involved the receiver or affected the property of the named defendants.

¶ 4. Among the approximately 800 individuals who invested with defendants under the EB-5 Program are five foreign nationals who each invested $500,000 and paid an additional administrative fee of $50,000. These investors seek to intervene here. Intervenors also purport to represent a similarly situated class encompassing others who made investments with defendants.

2

¶ 5.    In the SEC case, the receiver settled with Raymond James and Associates—an institution at which Quiros maintained several accounts that were funded with and used to transfer EB-5 investment funds—for $150,000,000.  The receiver used these funds from Raymond James to offer reimbursement to intervenors for the $500,000 principal that they had invested with the Jay Peak Projects.  However, the receiver concluded that the $50,000 administrative fee was "not subject to reimbursement." According to one of the offering documents, this fee was intended to be "nonrefundable" to reimburse the general partner involved in that project for "expenses incurred" during the "development of the Project, business planning, and to produce and distribute this Offering."

¶ 6.    Two intervenors—so-called Phase I investors—released any interest in recovering the $50,000 administrative fee in return for the recovery of their investment principal, while two other intervenors expressly reserved their right to recover the fee.  The last intervenor also did not release his interest in the administrative fee and refused to accept reimbursement from the receiver for the principal of his investment.  The receiver has represented that he will pay this intervenor his $500,000 principal investment if he "wish[es] to accept payment."

¶ 7.    On April 14, 2016, two days after the SEC case was filed, the State of Vermont brought its own enforcement action in state court—the current case—seeking, among other things, "full restitution to all defrauded investors" and the return of illegally obtained investment funds from Quiros and Stenger in their individual capacities and from a series of business entities involved in the projects.  The State alleged multiple violations under the Vermont Uniform Securities Act (Chapter 150 of Title 9) and the Consumer Protection Act (Chapter 63 of Title 9). The parties engaged in motion practice and discovery proceedings lasting nearly two years. This included the production of over one million pages of documents.

¶ 8.    On appeal, intervenors highlight a series of events that took place starting in early 2018.  On February 16, 2018, the State filed two motions seeking both temporary and permanent

3

orders freezing defendants' assets. The trial court set an emergency hearing on the motion for temporary asset freeze for February 23, 2018. On that date, the parties filed a stipulation, pursuant to which the temporary freeze went into immediate effect pending further briefing on the motion for a permanent order. In March and April 2018, the parties fully briefed the State's permanent asset-freeze motion, culminating in a hearing on April 4, 2018, at which the court granted the motion. On April 9, 2018, the court issued an order freezing a significant portion of Quiros's assets. This order took effect immediately following the expiration of the asset-freeze order imposed by the federal court in the SEC enforcement case.

¶ 9. Meanwhile, commencing in May 2017, intervenors, as named plaintiffs representing similarly situated investors purportedly defrauded by Quiros, Stenger, and the Jay Peaks Project entities, sued the State of Vermont and several current and former state officials and employees alleging breach of contract based upon a state-run EB-5 investment processing center's alleged failure to sufficiently oversee the project to prevent the purported fraud. On April 20, 2018, the superior court dismissed that case for failure to state a claim. Intervenors have appealed that decision to this Court.[1]

¶ 10. On May 15, 2018, just over two years since the filing of the state enforcement action, intervenors moved under Vermont Rule of Civil Procedure 24(a) and (b) to intervene in this action.[2] Intervenors sought the "full recovery of any judgment obtained in this action" and the "[d]isgorgement and restitution of all earnings, profits, compensation and benefits." They also sought, from both the State and defendants, "[p]unitive damages . . . on account of the outrageous nature of Plaintiffs' and Defendants' willful and wanton disregard for [Intervenors'] rights."

---

[1] We need not—and do not—rely on the outcome of that case to decide the present matter. We recount it to explain the context in which this appeal has arisen.

[2] Intervenors sought both intervention as of right and permissive intervention.

¶ 11. The superior court denied the motion to intervene. First, the court concluded that intervenors did not demonstrate an interest in the case that would be impaired if they were not permitted to intervene. Second, the court was not convinced that intervenors' claims "line[d] up with" the claims of the existing parties to the case. Third, the court expressed concern that intervenors' claims would introduce collateral issues, which would delay the outcome of the case resulting in prejudice to the existing parties. Fourth, the court noted that intervenors "have a lawsuit of their own in process." Fifth, despite intervenors' assertion to the contrary, the court concluded that the federal receiver was properly protecting their interests. Finally, the court noted that intervenors could potentially violate the federal bar order if they were permitted to intervene. The court did not directly discuss the timeliness of the attempted intervention.

¶ 12. On July 12, 2018, a few days after the court denied the motion to intervene, the State, Quiros, and Stenger filed a stipulation agreeing to settle the statutory claims in this case. Under the terms, Quiros agreed to pay the State $2,000,000 and Stenger agreed to pay $100,000. The State released all claims against Quiros and Stenger, neither of whom admitted to or denied liability. Among other conditions, the stipulation required Quiros to transfer five Vermont properties to the State. The funds obtained as a result of this stipulation were to be reinvested in the Northeast Kingdom to spur economic development in the region, which suffered as a result of defendants' actions.

¶ 13. On appeal, intervenors argue that the superior court improperly denied their motion to intervene as of right under Rule 24(a). They assert that their motion to intervene only became "colorable" once the court's freeze order took effect, which created a "pool of money" that could be used to satisfy their putative claim for reimbursement of the administrative fee. Therefore, they argue, the motion was timely because they moved to intervene within six weeks of the asset-freeze order going into effect. Intervenors also argue that the other prongs of intervention by right are met. Alternatively, intervenors argue that the court abused its discretion by denying their motion

5

for permissive intervention under Rule 24(b). We conclude that, under a de novo standard of review, the intervention was untimely, and because untimeliness is a threshold issue under both Rule 24(a) and (b), we affirm.

## II. Standard of Review

¶ 14. We review the denial of a motion to intervene as of right de novo. In re GMPSolar-Richmond, LLC, 2017 VT 108, ¶ 19, 206 Vt. 220, 179 A.3d 1232 ("[W]e review [whether party established right to intervene] de novo, and this is consistent with our standard of review for questions of law."). However, we review discretionary decisions of trial courts "under an abuse of discretion standard of review." HSBC Bank USA N.A. v. McAllister, 2018 VT 9, ¶ 8, 206 Vt. 445, 182 A.3d 593. We therefore review the denial of a motion for permissive intervention for an abuse of discretion. Helm. v. Helm, 139 Vt. 225, 227, 424 A.2d 1081, 1082 (1981).

¶ 15. Because the timeliness of a motion to intervene is "a matter within the discretion of the court," normally we review the trial court's ruling on timeliness for an abuse of discretion. Ernst v. Rocky Road, Inc., 141 Vt. 637, 639, 450 A.2d 1159, 1160 (1982). However, when—as here—a trial court denies a motion to intervene but makes no mention of the motion's timeliness, we are left without a ruling to review for an abuse of discretion. In such a case, if there are sufficient facts to decide the issue of timeliness within the record—and assuming neither party is seeking a remand to establish a disputed issue of material fact—then, in accordance with four federal circuit courts of appeal, we review timeliness de novo. Johnson v. City of Memphis, 73 F. App'x 123, 131 (6th Cir. 2003) ("[W]hen a district court fails to make findings regarding timeliness, our review of the timeliness prong changes from abuse of discretion to de novo."); Utah Ass'n of Ctys. v. Clinton, 255 F.3d 1246, 1249 (10th Cir. 2001) ("When the court makes no findings regarding timeliness, however, we review this factor de novo."); League of United Latin Am. Citizens v. Wilson, 131 F.3d 1297, 1302 (9th Cir. 1997) ("[B]ecause the district court below denied [the] intervention motion . . . without specifying whether or not its denial was premised

upon a finding of untimeliness, we have no way of determining whether it abused its discretion with regard to that element; consequently, we must review the timeliness issue in this case de novo."); Sierra Club v. Espy, 18 F.3d 1202, 1205 n.2 (5th Cir. 1994) ("Although the timeliness of intervention is generally reviewed for abuse of discretion, where the district court makes no finding regarding timeliness, we review this factor de novo." (citation omitted)); cf. Mohr v. Vill. of Manchester, 161 Vt. 562, 562, 641 A.2d 89, 90 (1993) (mem.) (remanding appeal of order denying Rule 24 motion because of insufficient "record of how that decision was reached"); see also Sorge v. State, 171 Vt. 171, 174 n.*, 762 A.2d 816, 818 n.* (2000) ("This Court may affirm a trial court's decision if the correct result is reached, despite the fact that the court based its decision on a different . . . rationale.").

### III. Timeliness

¶ 16.     When a motion to intervene[3] is filed, the timeliness requirement under Rule 24(a) and (b) is a threshold question. NAACP v. New York, 413 U.S. 345, 365 (1973) ("Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of [Federal Rule 24] that the application must be 'timely.' If it is untimely, intervention must be denied. Thus, the court where the action is pending must first be satisfied as to timeliness."). An intervenor bears the burden of meeting all of the requirements for intervention, including timeliness. See Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co., 922 F.2d 92, 96 (2d Cir. 1990). The timeliness of a motion to intervene is assessed using a totality-of-circumstances

---

[3]     A trial court must grant a motion to intervene as of right if it is (1) timely; (2) the intervenor has "an interest relating to the property or transaction" that is the subject of the underlying action; (3) the intervenor would be impaired or impeded in his or her ability to protect that interest depending on the outcome of the action; and (4) the intervenor's interest is not adequately represented by the existing parties. V.R.C.P. 24(a). Permissive intervention is available if the motion is (1) timely and (2) the prospective intervenor's "claim or defense and the main action have a question of law or fact in common." V.R.C.P. 24(b). Vermont Rule 24 is "substantially identical to Federal Rule [of Civil Procedure] 24" with "minor modifications" that are of no consequence to our analysis here. Reporter's Notes, V.R.C.P. 24.

analysis. <u>Ernst</u>, 141 Vt. at 640, 450 A.2d at 1160. We have identified four factors that may be considered in assessing timeliness: (1) possible harm to plaintiffs; (2) an intervenor's ability to have sought intervention sooner; (3) the progress of the case; and (4) the availability of other means to join case. <u>Shahi v. Madden</u>, 2010 VT 56, ¶ 10, 188 Vt. 142, 5 A.3d 869.

¶ 17. Here, intervenors did not move for intervention until May 2018, more than two years after the complaint was filed in April 2016. Based on the facts and circumstances of this case, we conclude that intervenors have failed to carry their burden to show that they sought intervention in a timely manner. We therefore affirm.

¶ 18. The State asserts that intervenors were aware of this enforcement action for "more than two years." Intervenors have not contradicted this assertion and circumstances suggest that, indeed, intervenors were aware of the existence of this case during that time period. The case was the subject of widespread media reporting. Media coverage has been viewed as a factor when assessing an intervenor's ability to have intervened sooner. <u>NAACP</u>, 413 U.S. at 366-67. A news article, dated April 2017, references the existence of this case. And the case is specifically mentioned in the settlement agreement between Raymond James and the Vermont Department of Financial Regulation, entered on June 29, 2016, that was filed by intervenors in support of their motion to intervene. Furthermore, in May 2017, one year before the motion to intervene was filed, intervenors initiated a civil suit against the State, raising effectively identical claims to those asserted here against the State in the intervention motion. That intervenors were represented by competent counsel, pursued claims against the State in a parallel case for almost one year before moving to intervene, and made substantially identical claims in that proceeding as they do here, suggests that intervenors were aware of this proceeding, which was initiated by their opponent and involved common issues—the alleged EB-5 fraud with the Jay Peaks Projects. Intervenors also knew about the SEC case because they were offered reimbursement by the receiver for their respective $500,000 investments in the Jay Peaks Projects. Knowledge of the federal enforcement

8

case is an indication, particularly to persons represented by competent counsel, of an awareness that this case exists, because both cases involve substantially identical issues—the enforcement of securities-fraud statutes—and they were initiated two days apart. Therefore, we conclude that intervenors knew or should have known about this case and their stated interest in its outcome when it was filed in April 2016, or within a reasonable time thereafter, but they did not move to intervene until May 2018.

¶ 19.    Intervenors suggest that they could not move for intervention sooner because, while this case was pending, the State changed its strategy, and ceased to adequately represent their interests. To whatever extent this shift in strategy may have occurred—we take no opinion on the matter—it would have been known to intervenors, at a minimum, when they filed a separate action against the State. That case was filed in May 2017, nearly one year before the motion to intervene was filed in May 2018. Even if this shift in strategy put intervenors' interests at issue in this case, and even if no such interest existed at the time the complaint was filed, the motion would still be untimely.

¶ 20.    Intervenors assert that their interest in the proceedings here was "not colorable" until the asset-freeze order went into effect.[4] This argument misconstrues the standard for timely intervention. We assess timeliness based upon an intervenor's ability (or lack thereof) to have intervened sooner in a case. Shahi, 2010 VT 56, ¶ 10 (noting that timeliness is assessed based on intervenor's ability to have intervened sooner in the proceedings). We do not analyze timeliness based on the ability of an intervenor to ultimately collect on a judgment against a party.

---

[4] Intervenors cite a Second Circuit opinion to support their theory that the State freeze order created a "colorable" interest supporting intervention where such an interest did not exist before. Wash. Elec. Co–op., Inc., 922 F.2d at 97 ("[A]n interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule."). They further assert that this case stands for the proposition that they could not intervene here until the freeze order created a "pool of money" from which they could receive the nonrefundable administrative fees.

¶ 21.     To whatever extent the other elements of intervention are met here—questions that we do not and need not answer—intervenors could have sought intervention any time after the complaint was filed.  Intervenors' interest in intervention did not change when the freeze order went into effect.  It is apparent that intervenors were aware of the existence of this case for some time and there was nothing precluding them from seeking to intervene much sooner.  Under the Ernst totality-of-the-circumstances analysis, we also consider the progress in the action at the time intervention is requested.  Ernst, 141 Vt. at 640, 450 A.2d at 1160.  When intervenors filed their motion, a significant volume of discovery had been exchanged and settlement talks had progressed to the point that agreements between the parties, disposing of this case, were imminent.  To permit intervention after so much time had elapsed, and when the original parties were near settlement, would violate the timeliness requirement of Rule 24(a) and (b).

Affirmed.

FOR THE COURT:

_____

Associate Justice